*Christopher D. Hamilton, et al. v. Benjamin Kirson, et ux.*, No. 78, September Term, 2013.

*Candace Renee Alston, et al. v. 2700 Virginia Avenue Associates, et al.*, No. 100, September Term, 2013.


**NEGLIGENCE—LEAD-PAINT POISONING—CIRCUMSTANTIAL EVIDENCE**
Lead-paint poisoned plaintiffs may prove the causation element of a *prima facie* negligence case through purely circumstantial evidence. When doing so, however, the plaintiff must put forth a theory of causation and sufficient supporting evidence that, if believed, would permit a jury to draw the necessary logical inferences of the presence of lead-based paint on the premises at the relevant time(s). In the present summary judgment cases, the evidence was insufficient to infer that the defendants' conduct was a substantial factor in bringing about the alleged injuries because the plaintiffs failed to put forth evidence that the subject properties contained lead-based paint at the relevant time(s).

**NEGLIGENCE—CIRCUMSTANTIAL EVIDENCE—EXPERT TESTIMONY**
In order for expert testimony to be admissible, a sufficient factual basis must support the expert's opinion so that the opinion does not amount to conjecture, speculation, or incompetent evidence. In these cases, the experts had an insufficient factual basis from which to reach the conclusion that the subject properties contained lead-based paint and were a substantial contributor to the plaintiffs' injuries.

Argued 3 April 2014

Circuit Court for Baltimore City
Case No. 24-C-09-003482

No. 78, September Term, 2013

CHRISTOPHER D. HAMILTON, ET AL.

v.

BENJAMIN KIRSON, ET UX.

Circuit Court for Baltimore City
Case No. 24-C-10-000721

No. 100, September Term, 2013

CANDACE RENEE ALSTON, ET AL.

v.

2700 VIRGINIA AVENUE
ASSOCIATES, ET AL.

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Wilner, Alan M. (Retired,
            Specially Assigned),

JJ.

Opinion by Harrell, J.

Filed: June 20, 2014

We consolidate these two cases, *Hamilton v. Kirson*, No. 78, September Term, 2013, and *Alston v. 2700 Virginia Avenue Associates*, No. 100, September Term, 2013, for purposes of this opinion. In each case, a plaintiff or plaintiffs brought, among other claims,[1] a negligence action against landlords to recover for his or her injuries resulting from lead paint poisoning.[2] Neither plaintiff adduced direct evidence that the respective demised premise was a substantial contributor to the injuries or that the interiors of the homes contained lead paint, but rather relied on circumstantial evidence in an effort to satisfy the causation element of a *prima facie* negligence claim. After discovery was conducted, the landlords filed motions for summary judgment, which the Circuit Court for Baltimore City granted. In both cases, the trial judges reasoned that the respective plaintiffs failed to produce sufficient evidence to present a *prima facie* negligence case with regard to the causation element. Our review on appeal focuses on evaluating what quantum or quality of circumstantial evidence in lead paint poisoning cases is sufficient to satisfy the causation element of a *prima facie* negligence claim, so as to submit the case to the fact-finder.

---

[1] Each case alleged an additional count of unfair trade practices, in violation of the Maryland Consumer Protection Act ("CPA"), *see* Md. Code (1975, 2005 Repl. Vol.), Commercial Law Article, § 13-301, et seq., for leasing premises containing lead paint. Because the parties did not raise any issue regarding these counts on appeal, we do not discuss these claims further and focus solely on the negligence counts.

[2] Both cases were initiated by the victims after they reached adulthood.

Because the facts and issues presented in the consolidated cases differ slightly, we set forth first the background of each case. Then, we shall address collectively the shared relevant legal precedents, applying the relevant case law and legal principles to each case.

## I. BACKGROUND

### A. *Alston v. 2700 Virginia Avenue Assocs.*

On 26 January 2010, Candace Alston filed suit in the Circuit Court for Baltimore City against 2700 Virginia Avenue Associates, Theodore Julio, Lawrence Julio, and others, alleging that the defendants acted negligently as landlords in providing premises containing chipping, peeling, and flaking lead paint in violation of the Baltimore City Housing Code (hereinafter, "Housing Code").[3] Subsequently, an Amendment by Interlineation added to the causes of action Brian Alston (Candace's sibling) and his claims. The Complaint and amendments alleged that Candace and Brian (hereinafter, collectively the "Alstons") suffered lead-based paint poisoning, Candace while residing

---

[3] Although not specifically identified in the Complaint, we presume by how the case unfolded that the relevant provisions are Housing Code, Baltimore City Code (2000 Repl. Vol.), Art. 13, § 702, 703 & 706. Section 702 requires that "[e]very building . . . occupied as a dwelling shall, while in use . . . be kept in good repair, in safe condition, and fit for human habitation." Section 703 provides, in relevant part, that "good repair and safe condition shall include . . . [a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint." Next, section 706 requires that (1) "[a]ll interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition," and (2) "[n]o paint shall be used for interior painting of any dwelling . . . unless the paint is free from any lead pigment."

for consecutive periods at dwellings located at 2752 Virginia Avenue and 2810 Virginia Avenue and Brian at 2752 Virginia Avenue.

For her part, the Alstons' mother, Leslie Sidbury, could not remember the exact time periods and locations of their residences during the relevant times. The Complaint alleged that the Alstons' mother and her children resided at a number of properties between 1989 and 1995. Specifically, Candace, who was born on 27 January 1989, "lived in the dwelling or frequented the dwelling as an invitee of the tenant during 1989-1995" for the following properties: (1) 3006 Woodland Avenue; (2) 3501 Oakmont Avenue; (3) 303 N. Gilmor Street; (4) 2752 Virginia Avenue; and, (5) 2810 Virginia Avenue.

Subsequently, in the Amendment by Interlineation adding as a victim Brian Alston, who was born on 13 August 1990, the Alstons narrowed the matter somewhat that their mother lived at the 2810 Virginia Avenue property between 1992-1993. Then, they lived as a family at 2752 Virginia Avenue between 1993-1995. During the defendants' later deposition of Ms. Sidbury, it was discovered that she did not remember the exact location of their residence, but approximated that the house was located in the 2800 block on Virginia Avenue. Plaintiffs' blood lead level testing slips listed, however, only 3006 Woodland Avenue as their address.

During discovery, the Alstons identified Dr. Michael Weitzman as their expert witness. Dr. Weitzman opined, relying on circumstantial evidence solely, that 2752 Virginia Avenue and 2810 Virginia Avenue (hereinafter, the "subject properties") were a source of, and a substantial contributing factor to, the Alstons' lead paint poisoning and

-3-

resulting injuries. To support this opinion, Dr. Weitzman relied on the following facts: (1) the Alstons lived in and/or visited the subject properties during the time period that they demonstrated elevated blood lead levels; (2) the residences had chipping, peeling, or flaking paint during the relevant time period; (3) the residences were older homes in Baltimore, built before 1979;[4] and (4) the Alstons exhibited elevated blood lead levels at the time they lived in the subject properties. No scientific testing was conducted of the paint (chipping, flaking, peeling, or otherwise) at the residences for the presence of lead.

Defendants (Respondents here) filed a Motion for Summary Judgment on 22 December 2010, arguing that the Plaintiffs "failed to sustain their burden of proving that they were exposed to and ingested chipping, peeling, or flaking lead-based paint in violation of the Baltimore City Housing Code at the Defendants' properties . . . ." Specifically, Respondents argued that Plaintiffs' expert relied on insufficient assumptions to provide a factual basis for his opinion that Plaintiffs were exposed to a lead paint hazard at Defendants' properties. Respondents emphasized that there is no direct evidence that Plaintiffs resided at Defendants' properties or "that Defendants' properties contained lead paint hazards, or defective lead-based paint, during Plaintiffs' alleged tenancy at the properties." Moreover, Respondents pointed out that "Plaintiffs' source expert also cannot eliminate [other] potential source[s] of Plaintiffs' recorded [blood]

_____

[4] According to the deposition of Dr. Weitzman, he found the age of the house relevant because the State of Maryland issued a report finding that 75% of houses in Baltimore City were likely to have lead-based paint if built between 1950 and 1978. In 1978, lead-based paint was banned. This report was not included in the record.

lead levels, which precludes Plaintiffs from providing adequate circumstantial evidence of exposure at the properties."

After a hearing on the motion on 6 February 2012, the trial judge granted summary judgment, stating:

> In this case, the identification of the address is an interesting issue. I'm not going to grant summary judgment on that basis, because I believe that the plaintiff has come up – has come forward with, it may be the barest showing, but it's a bare showing to tie herself to these two addresses on Virginia Avenue.
>
> And this is unlike a case where the defendant comes forward with sworn statements in whatever form; interrogatories, affidavits, depositions that refute any possibility that the plaintiff actually lived or spent time at those addresses.
>
> So although it is extremely sketchy in this case, both the identification of the specific properties and the years when the plaintiffs were living there, I don't think the defendant prevails on that basis.
>
> **I do think the defendant prevails on the basis that as to these properties the plaintiffs cannot show the requisite causation of any elevated blood lead levels derived from these properties**.
>
> I accept that the plaintiffs have shown that there was deteriorating paint at the properties. And I will even, for purposes of the motion go so far as to accept that the plaintiffs have shown that they exhibited elevated blood lead levels at around the time that they say they were living in these properties. **What is missing is evidence that would tie those elevated blood lead levels to the specific conditions in these properties. And I accept the possibility that that could be proven indirectly by circumstantial means.**
>
> But I think the essential logical ingredient that must be present in order for *Dow* or a theory like *Dow* to apply is that **logically there must be a -- a very strong conclusion that the lead that the plaintiffs were experiencing had to come from this source because there is no other logical source that is available.**

Now, there may be a number of ways that could be done. I've suggested one of them would be if there were visitation properties, that there is some evidence that tends to exclude those.

There might be evidence that the paint wasn't deteriorating in those. There might be evidence that they were built after a period when lead paint was likely present. There might be evidence that the visits were very short, were supervised closely and the children didn't ingest paint. There may be a number of bases that might be advanced by plaintiff.

**But here you simply have two wide open possible properties at the same time, either of which could have been the source of the lead that is alleged. And that is insufficient to establish the *prima facie* case that the plaintiff would have to show on negligence.**

. . .

For those reasons, I think that the moving defendants with respect to these two addresses on Virginia Avenue are entitled to summary judgment. And I'll grant summary judgment as to both plaintiffs as to these defendants.

(Emphasis added.) The trial judge issued a written order to like effect, stating that the Motion for Summary Judgment was granted "[f]or the reasons stated on the record at the hearing."

Plaintiffs appealed timely to the Court of Special Appeals. The intermediate appellate court affirmed the judgment of the trial court in an unreported opinion filed on 10 July 2013. Plaintiffs-Petitioners filed a Petition for a Writ of Certiorari, which this Court granted, 435 Md. 266, 77 A.3d 1084 (2013), to consider the following questions:

(1) By following its decision in *West v. Rochkind*, 212 Md. App. 164, 66 A.3d 1145 (2013), did [the] CSA [Court of Special Appeals] [here] improperly undermine the common law principle that the law makes no distinction between the weight to be given to circumstantial evidence and direct evidence and that no greater degree of certainty is required of circumstantial evidence than of direct evidence?

(2) Did [the] CSA's decision in *West* improperly change a Plaintiff's burden of proof in a circumstantial evidence case from "preponderance of the evidence" to greater than "beyond a reasonable doubt?"

(3) Does [the] CSA's holding improperly require a Plaintiff in a lead-paint case to prove that a given property was "the only possible explanation" for a Plaintiff's injuries in order to make a circumstantial case?

## B. *Hamilton v. Kirson*

On 28 May 2009, Christopher Hamilton filed in the Circuit Court for Baltimore City his initial complaint alleging several negligence claims against Lola Singer, the previous owner of property at 2231 Barclay Street (hereinafter, the "Singer property"), and Benjamin and Karen Kirson (hereinafter, collectively the "Kirsons"), the previous owners of property at 754 Bartlett Avenue (hereinafter, the "Kirson property" or the "subject property"). According to the Complaint, these properties "contained lead-based paint in such deteriorated conditions that it was peeling, chipping and flaking from the walls, baseboards, windowsills and other areas of the premises," as well as the presence of lead paint dust and powder. It was alleged that Christopher, while living at these residences, ingested lead-based paint chips and dust and, as a consequence, suffered permanent brain damage resulting in developmental and behavioral injuries. The Complaint alleged that Christopher resided at 2231 Barclay Street from 1992-1993, and at 754 Bartlett Avenue from 1993-1995.

On 21 August 2009, the Complaint was amended to add a second plaintiff—Christopher's brother, Rickey—as well as additional defendants and allegations. Specifically, the Hamiltons added allegations that they were exposed to lead-based paint at 445 E. Lanvale Street, where they lived from 1991-1992 and which was owned and

managed by Ralph Small and the Patella Realty Corporation, the added defendants. On 2 April 2010, the Hamiltons amended their complaint again to add allegations involving two additional properties which Plaintiffs visited as children and which were owned and managed by other newly-added defendants.[5]

Rickey was born on 5 April 1989. From his birth until approximately April of 1990, Rickey lived with his mother, maternal grandparents, sister, and uncle somewhere on the 2300 block of Barclay Street. Rickey moved with the same family members to 445 East Lanvale Street approximately in the summer of 1990. A short time later, on 5 September 1990, Christopher was born and lived in the same house as Rickey from that point in time. At some point in 1992, the family moved to 2231 Barclay Street where they resided until approximately the fall of 1993, at which time the family moved again to 754 Bartlett Avenue. The family lived at that address until some point in 1995. Then, the family moved to 1604 Gorsuch Avenue, where they resided until 1998. Between 1990 and 1994, Rickey was tested six times for blood lead levels ("BLL"). Between 1991 and 1995, Christopher was tested nine times. The results of these tests are detailed in the following chart:

---

[5] Ultimately, due to a recognized lack of evidence regarding several of the additional properties, the Hamiltons dismissed, prior to the summary judgment stage, their claims against all defendants, save Singer and the Kirsons. Singer was not dismissed as a defendant until after the Hamiltons noted an appeal to the Court of Special Appeals. Thus, our discussion of the relevant facts focuses on the claims involving the Kirson property primarily and the Singer property only to the extent relevant and necessary.

| DATE | RICKEY'S AGE | RICKEY'S BLL | CHRIS' AGE | CHRIS' BLL |
|---|---|---|---|---|
| **2300 block of Barclay Street (5 April 1989 to approximately summer of 1990)** | | | | |
| --- | Newborn | --- | --- | --- |
| **445 East Lanvale Street (summer of 1990 to 1992)** | | | | |
| 15 August 1990 | 17 mos. | NR | --- | --- |
| 10 April 1991 | 24 mos. | NR | --- | --- |
| 27 June 1991 | --- | --- | 9 mos. | 7 mcg/dL |
| 6 February 1992 | --- | --- | 17 mos. | 7 mcg/dL |
| 23 April 1992 | --- | --- | 19 mos. | 8 mcg/dL |
| **2231 Barclay Street\* (some point in 1992 to fall of 1993)** | | | | |
| 12 January 1993 | 45 mos. | 12 mcg/dL | --- | --- |
| 26 March 1993 | 47 mos. | 11 mcg/dL | --- | --- |
| 13 May 1993 | --- | --- | 32 mos. | 14 mcg/dL |
| **754 Bartlett Avenue\*\* (fall of 1993 to 1995)** | | | | |
| 24 September 1993 | 53 mos. | 14 mcg/dL | --- | --- |
| 10 November 1993 | --- | --- | 38 mos. | 17 mcg/dL |
| 26 January 1994 | --- | --- | 41 mos. | 15 mcg/dL |
| 12 May 1994 | --- | --- | 44 mos. | 15 mcg/dL |
| 28 October 1994 | 66 mos. | 10 mcg/dL | --- | --- |
| 2 February 1995 | --- | --- | 53 mos. | 11 mcg/dL |
| 11 October 1995 | --- | --- | 61 mos. | 10 mcg/dL |
| **1504 Gorsuch Avenue (1995 to 1998)** | | | | |
| 13 March 1996 | 83 mos. | 7 mcg/dL | --- | --- |

\* The 2231 Barclay house was owned by Singer.
\*\* The 754 Bartlett Ave. house was owned by the Kirsons and is the subject of the present appeal.
*Shaded blocks represent those test results which indicate elevated blood lead levels.*[6]

---

[6] Blood lead levels are measured in micrograms per deciliter. According to Dr. Simon's report, a child is considered to have elevated blood lead levels at 10 mcg/dL.

During discovery, the Hamiltons retained Arc Environmental, Inc., to survey the 754 Bartlett Avenue property for lead-based paint. On 4 March 2011, Arc tested (or attempted to test) the property and issued a report of its findings on 9 March 2011. According to the report, the X-ray fluorescence analyzer detected lead-based paint, above the Maryland standard ($>0.7$ mg/cm$^2$),[7] on four of the fourteen surfaces tested—the front porch wall, the front window apron and casing, and the front basement window header. The report noted that the property is "an occupied two story brick row home. The inspector knocked on the front door of the property and spoke with a female resident who stated that she has lived at the property for many years and subsequently denied the inspectors [sic] request to test the interior of the property, but allowed exterior testing."

Additionally, as part of discovery, the Hamiltons identified Dr. Jacalyn Blackwell-White, a board-certified pediatrician, as a medical causation expert and Dr. Robert Simon as an industrial hygiene expert and environmental lead risk assessor. Drs. Blackwell-White and Simon authored causation reports and were deposed.

Dr. Blackwell-White opined:

Rickey Hamilton experienced toxic levels of lead elevation during his younger years. Within a reasonable degree of medical probability, he suffered brain damage as a result of that exposure. The most likely source/sources of Rickey's exposure include 2231 Barclay Street and 754

---

[7] In Maryland, "lead-containing substance" is defined, in relevant part, as "any paint, plaster or other surface coating material containing . . . more than 0.7 milligrams per square centimeter by the X-ray fluorescence ['XRF'] analyzer." COMAR 26.02.07.02. According to the Arc Environmental report, where the XRF analyzer provides a reading of 0.7mg/cm$^2$ or less, the surface is classified as "negative," and where the reading is above the standard, the surface is classified as "positive."

Bartlett Avenue. However, the visitation properties of 417 E. North Avenue and 510 E. 20th Street cannot be excluded. There was a paucity of descriptive interior surface information, lead paint information and details about the visits included concerning these properties.

With regard to Christopher Hamilton, Dr. Blackwell-White opined:

It is my opinion that Christopher Hamilton was exposed to sustained levels of lead at an early age. The possible sources of Christopher's lead exposure include 445 E. Lanvale Street, 2231 Barclay Street, 754 Bartlette [sic] Avenue, 417 E. North Avenue and 510 E. 20th Street. Based on the information available to me, more likely than not, Christopher was exposed to lead based paint at 2231 Barclay Street and 754 Bartlette [sic] Avenue because he experienced a significant rise in lead levels which was sustained during his residence at these two addresses. There was no significant change in blood lead level after moving from 2231 Barclay Street to 754 Bartlette [sic] Avenue. There is not enough information available to me to implicate the Lanvale Street property over the visitation properties as a source of lead exposure for the first three lead level elevations. It is my opinion that within a reasonable degree of medical probability, he sustained brain damage as a result of early lead exposure and that his impairment is lifelong.

Plaintiffs asked Dr. Simon "to determine if [Rickey's and Christopher's] residency at 2231 Barclay Street and 754 Bartlett Street, Baltimore, MD, during their early childhood, were substantial contributing sources of lead exposure during that time period." Dr. Simon stated that the 754 Bartlett Avenue house "was built in 1920 and would more likely than not have had LBP [lead-based paint] based upon the age and use of lead paint during that time period . . . ."[8] Moreover, Dr. Simon noted that the 754

_____

[8] Dr. Simon opined that "[t]he age of housing is important in the assessment of presence of lead-based paint . . . ." The basis for this opinion was that:

the Maryland Department of Environment which presumes that chipped, peeling, and flaking paint in housing built before 1950 contained lead. The

Continued…

-11-

Bartlett Avenue house contained paint in deteriorated condition. Based on that information, Dr. Simon concluded:

> [T]he residences at 2231 Barclay Street and 754 Bartlett Avenue, Baltimore, MD were the substantial, contributing locations and sources for elevated blood lead levels (EBLs) and lead poisoning exposure for both Ricky, Jr. [sic] and Christopher Hamilton during the first 6+ years of their childhoods. There was no indication in the data file that any other locations contributed to their EBLs [elevated blood lead levels] and lead poisoning during this time period.

After discovery was completed, the Kirsons moved for summary judgment on several grounds. First, they argued that there was no Housing Code violation demonstrating a negligent act on the part of Defendants and, thus, Plaintiffs did not have an actionable negligence claim. Specifically, the Kirsons pointed out that Plaintiffs'

---

Cont'd

> USEPA [U.S. Environmental Protection Agency] has estimated that housing contained lead-based paint (LBP) based upon house age as listed below . . . .

| % Containing LBP | Built Age of Housing |
| --- | --- |
| 87% | before 1940 |
| 69% | between 1940 to 1960 |
| 24% | between 1960-1978 |

Dr. Simon referred also to a press release on a report by the Maryland Department of the Environment, which cited the U.S. Census Bureau as reporting that "95% of houses were likely to have LBP if built before 1950 and that 75% of houses were likely to have LBP if built between 1950 and 1978." *See* Press Release, First Lady Hon. Kathleen O'Malley, MDE Announce Results of Lead Poisoning Report (Aug. 27, 2010), http://www.mde.state.md.us/programs/PressRoom/Pages/1296.aspx (referring to the Maryland Department of the Environment, *Childhood Blood Lead Surveillance in Maryland Annual Report 2009* (Aug. 2010)).

medical causation expert, Dr. Blackwell-White, stated that the blood lead levels were consistent with exposure to airborne lead dust. Plaintiffs' negligence claims, however, are based on violations of the Housing Code's prohibition of peeling or chipping paint.

Second, the Kirsons argued that summary judgment was appropriate because there was no direct evidence that the subject property was the source of the Hamiltons' lead poisoning and, moreover, Plaintiffs' source experts' opinions that the Hamiltons' blood lead levels were caused by exposure to lead hazards at the subject property, 754 Bartlett Avenue, had an insufficient factual basis. The Kirsons maintained that, in order for the Hamiltons to prove that the property had lead-based paint, testing was required for the specific locations alleged as peeling, flaking, or chipping at the time of Plaintiffs' elevated blood lead levels. The testing undertaken by Plaintiffs, however, was only of locations on the exterior of the subject property. The Hamiltons' mother stated in her deposition that the exterior of the house was not in disrepair and, thus, according to the Kirsons, the Hamiltons failed to produce the direct evidence that they were exposed to hazardous lead-based paint at the subject property.

Moreover, the Kirsons argued that the Hamiltons' experts based their opinions of the source of the Hamiltons' lead exposure on the assumption that, if the exterior of the house had lead paint, the interior of the house also contained lead-paint. According to the Kirsons, the experts based this assumption (and, therefore, their opinions) on the age of the house, the condition of the house, and the age and recorded blood lead levels of the Hamiltons at the time of the tenancy. Such assumptions, it was claimed, were insufficient to form the factual basis of an expert opinion. Additionally, the Kirsons

-13-

contended that the Hamiltons' source experts lacked a sufficient factual basis to conclude that the subject property was the source because they "did not rule out other potential sources of Plaintiffs' blood lead levels that were recorded while they lived at [the subject property]." Specifically, the Kirsons pointed out that the Hamiltons' source experts failed to consider the three other properties that the Hamiltons visited frequently or lived in during the time period before and during their lead poisoning[9] and failed to rule out that the blood lead levels were the result of environmental or ambient sources, even though both experts acknowledged that lead poisoning may be caused by these other sources.

The Hamiltons filed a Response in Opposition to the Kirsons' Motion for Summary Judgment, insisting that a sufficient factual basis existed to support the opinions of their experts. The Hamiltons emphasized that experts are permitted to use a combination of direct and circumstantial evidence to support their opinions. They maintained that, particularly in cases such as lead-paint poisoning, where often injured persons do not have the ability to obtain direct evidence through testing of the properties contemporaneously with their tenancy or afterwards in certain circumstances,

_____

[9] According to the Kirsons, Dr. Blackwell-White acknowledged that she could not rule out the three visitation properties because she lacked the information necessary to make that determination. Dr. Simon stated that, even though he assessed typically visitation properties when he performed lead risk assessments in the past, he was not provided with any environmental information regarding the other properties in this case.

circumstantial evidence is the only recourse.   Specifically, in this case, the Hamiltons stated:

> [T]he subject property was built in 1920, circumstantially leading to a finding that the structure contained lead-based paint.  Both Christopher and Rickey Hamilton ate paint chips while living there.  During their tenancy, Plaintiffs' blood lead levels remained elevated; significant because of Dr. Simon's testimony regarding the half-life of lead in a person's blood.  Neither Plaintiff had enough contact with the visiting properties to allow those houses to be considered significant contributing factors.  Lastly, a 2010 ARC Environmental test of the exterior of the property found lead-based paint.

Thus, according to the Hamiltons, "there is sufficient direct and circumstantial evidence to support the opinions of Dr. Blackwell-White and Dr. Simon."

The Circuit Court held a hearing on 10 August 2011.  After hearing argument, the Circuit Court stated, in pertinent part, on the record:

> I'm going to grant the motion.  I'm, you know. Actually, I guess, eventually we're going to get some more on a post-*Dow*[10] cases from the Appellate Courts.  But basically, my understanding, this is not enough for the circumstantial evidence. . . .   [T]he Court's not convinced that there's enough circumstantial evidence under *Dow* and I realized that that's something that, you know, as a city, eventually we've got some clarification.  But it's my understanding that there's sufficient, based upon the record here, that there's sufficient evidence about so many other, not abstract sources, but very real sources, that it's not sufficient.  So for that reason, I will grant the motion.

On the next day, 11 August 2011, the Circuit Court entered an order granting the Kirsons' Motion for Summary Judgment "for the reasons stated on the record in open court."

_____

[10] *Dow v. L & R Props., Inc.*, 144 Md. App. 67, 796 A.2d 139 (2002).

The Hamiltons appealed timely. On 30 April 2013, the Court of Special Appeals issued an unreported opinion affirming the Circuit Court's judgment granting summary judgment. We granted a Writ of Certiorari, on the Hamiltons' petition, 433 Md. 513, 72 A.2d 172 (2013), to consider the following questions:

> (1) Did the trial court err by refusing to allow plaintiffs' expert witnesses to testify that the defendant's property was a substantial contributing cause to plaintiffs' injurious lead exposure on the grounds that they did not sufficiently rule out other potential sources of lead exposure?

> (2) Did the trial court err by granting summary judgment for defendant on the grounds that there was insufficient evidence as to causation?

> (3) Is a *Dow* analysis applicable to a lead paint claim involving possible exposure at multiple properties?

### C. Consolidation

We consolidate these cases for decision because they present a common, over-arching inquiry—under what circumstances, if any, will circumstantial evidence alone of the possible presence of lead-based paint inside a residential property be sufficient to survive a defense motion for summary judgment challenging the sufficiency of proof of the causation element of a negligence claim against the landlord. There is much recent case law, particularly from the Court of Special Appeals, on the proof of lead paint poisoning causation through circumstantial evidence. We aspire here to consider these cases, add our judicial gloss to them, and resolve any inconsistencies.

### II. STANDARD OF REVIEW

In the present cases, the Circuit Court granted defense motions for summary judgment, concluding that Plaintiffs failed to produce sufficient circumstantial evidence

-16-

to make out a *prima facie* case regarding the causation element of a negligence claim. The Circuit Court, in granting the motions for summary judgment, rejected implicitly or explicitly Plaintiffs' experts' conclusions that the subject properties were a substantial contributing source of Plaintiffs' injuries. The Court of Special Appeals, in its unreported opinion in *Hamilton*, noted aptly the dual nature of the Circuit Court's decision:

> The Hamiltons argue that the circuit court erred in granting summary judgment because their experts had a sufficient factual basis for their opinions. They further assert that even without expert opinions, the other evidence was sufficient to show that the Bartlett address was a substantial contributing cause of their injuries. These two arguments go hand in hand because the evidence that the Hamiltons presented on causation was the same evidence the experts used to form their opinions. Thus, the circuit court decision contains two findings: 1) that the experts did not have a sufficient factual basis for their conclusions that the Bartlett property was a substantial contributing source, and 2) that the evidence the experts used as their factual basis was not enough to independently establish causation.

*Hamilton v. Kirson*, No. 1530, September Term, 2011, slip op. at 14-15 (Md. Ct. Spec. App. April 30, 2013), *cert. granted*, 433 Md. 513, 72 A.2d 172 (2013). Regardless of the dual nature of the decision, the case involved the grant of summary judgment and we review it as such.[11]

---

[11] It appears that the Court of Special Appeals in *Hamilton v. Dackman*, 213 Md. App. 589, 75 A.3d 327 (2013), and *Taylor v. Fishkind*, 207 Md. App. 121, 51 A.3d 743 (2012), reviewed the Circuit Court's grant of motions for summary judgment on the grounds of an insufficient basis for the expert's testimony under two standards of review. The intermediate court reviewed the trial court's decisions regarding the sufficiency of the experts' opinions under an abuse of discretion standard, and the decisions regarding the summary judgment without deference. That is not the standard to be employed.

Continued…

A circuit court may grant a motion for summary judgment, entering judgment in favor of the moving party, "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(e). Maryland's summary

---

Cont'd

This Court recognizes that "in order to pass muster at a summary judgment proceeding, the opponent must produce evidence that would be admissible at trial." *Helinski v. Rosenberg*, 90 Md. App. 158, 166, 600 A.2d 882, 886 *rev'd*, 328 Md. 664, 616 A.2d 866, *rev'd on other grounds*, *Rosenberg v. Helinski*, 328 Md. 664, 616 A.2d 866 (1992) (citing *Gooch v. Maryland Mechanical Sys., Inc.*, 81 Md. App. 376, 396, 567 A.2d 954 (1990)); *see also Gooch*, 81 Md. App. at 396, 567 A.2d at 954 ("facts proffered in opposition to the granting of a motion for summary judgment must be admissible in evidence") (citations omitted). Maryland Rule 5-702, which governs the admissibility of expert testimony, provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) **whether a sufficient factual basis exists to support the expert testimony**.

(Emphasis added.) Accordingly, where a circuit court grants a summary judgment motion on the grounds that the plaintiff's expert lacks a sufficient factual basis of admissible facts and the admissible evidence (if any) is insufficient independently to prove causation, the circuit court is making a decision on the admissibility of the expert's testimony as part of its summary judgment decision and, thus, is making a legal decision. Such a decision is reviewed on appeal without deference, as the grant of all summary judgment motions are. *See, e.g.*, *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 176-78, 831 A.2d 481, 486-87 (2003) (reviewing the denial of a motion for judgment and a motion for judgment notwithstanding the verdict without deference, even though the reasoning for the trial judge's decision was based upon the admissibility of the expert testimony due to an allegedly sufficient factual basis for concluding that accidental exposure to Freon caused the plaintiff's asthma).

-18-

judgment rule makes clear that "a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact." *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993) (citing *Heat & Power v. Air Products*, 320 Md. 584, 591, 578 A.2d 1202 (1990)). "In this regard, the standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct," *id.* (citations omitted), and is subject to no deference. *Tyler v. City of Coll. Park*, 415 Md. 475, 498, 3 A.3d 421, 434 (2010) (citations omitted).

> As such, in reviewing a grant of summary judgment, we review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Charles County Comm'rs* [*v. Johnson*]*,* 393 Md. [248,] 263, 900 A.2d [753,] 762 [(2006)]. We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party. *Conaway* [*v. Deane*]*,* 401 Md. [219,] 243, 932 A.2d [571,] 585 [(2007)]; *Charles County Comm'rs,* 393 Md. at 263, 900 A.2d at 762

*Id.*, 415 Md. at 498-99, 3 A.3d at 434.

That our appellate review is premised on assumptions favoring the non-moving party does not mean that the party opposing the motion for summary judgment prevails necessarily. Rather,

> in order to defeat a motion for summary judgment, the opposing party must show that there is a genuine dispute as to a material fact by proffering facts which would be admissible in evidence. Consequently, mere general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment.
> . . .
> [T]he mere existence of a scintilla of evidence in support of the plaintiffs' claim is insufficient to preclude the grant of summary judgment; there must be evidence upon which the jury could reasonably find for the plaintiff.

*Anderson* [*v. Liberty Lobby, Inc.*,] 477 U.S. [242,] 252, 106 S. Ct. [2505,] 2512 [(1986)]. We recognized in *Clea v. City of Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988), that while a court must resolve all inferences in favor of the party opposing summary judgment, "[t]hose inferences ... must be *reasonable* ones." (Emphasis in original.) In that case, we quoted Professor Wright, as follows:

> "It is frequently said that summary judgment should not be granted if there is the 'slightest doubt' as to the facts. Such statements are a rather misleading gloss on a rule that speaks in terms of 'genuine issue as to any material fact,' and would, if taken literally, mean that there could hardly ever be a summary judgment, for at least a slight doubt can be developed as to practically all things human. A better formulation would be that the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists."

312 Md. at 678, 541 A.2d 1303, quoting C. Wright, *The Law of Federal Courts* § 99, at 666-667 (1983).

*Beatty*, 330 Md. at 737-39, 625 A.2d at 1011-12 (some internal citations omitted).

Furthermore, "it is a settled principle of Maryland appellate procedure that ordinarily an appellate court will review a grant of summary judgment only upon the grounds relied upon by the trial court." *Bishop v. State Farm,* 360 Md. 225, 234, 757 A.2d 783, 787 (2000); *see also Lovelace v. Anderson*, 366 Md. 690, 695-96, 785 A.2d 726, 729 (2001).

## III. DISCUSSION

Generally, "[t]o state a claim for negligence a party must show '1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Taylor v. Fishkind*, 207 Md. App. 121, 148, 51 A.3d 743, 759 (2012) (quoting *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76, 642 A.2d 180 (1994)). Where an applicable statutory

-20-

scheme is designed to protect a class of persons which includes the plaintiff, "the

defendant's duty ordinarily 'is prescribed by the statute' or ordinance and . . . the

violation of the statute or ordinance is itself evidence of negligence." *Brooks v. Lewin*

*Realty III, Inc.*, 378 Md. 70, 78, 835 A.2d 616, 620 (2003) (quoting *Brown v. Dermer*,

357 Md. 344, 358-59, 744 A.2d 47, 55 (2000), *overruled in part on other grounds by*

*Brooks*, 378 Md. at 72, 835 A.2d at 617).

This Court set out in *Brooks* the requirements for a plaintiff to make out a *prima*

*facie* showing in a statutory violation lead paint poisoning negligence action:

> [I]n order to make out a *prima facie* case in a negligence action, all that a
> plaintiff must show is: (a) the violation of a statute or ordinance designed to
> protect a specific class of persons which includes the plaintiff, and (b) that
> the violation proximately caused the injury complained of. Proximate
> cause is established by determining whether the plaintiff is within the class
> of persons sought to be protected, and the harm suffered is of a kind which
> the drafters intended the statute to prevent. . . . It is the existence of this
> cause and effect relationship that makes the violation of a statute *prima*
> *facie* evidence of negligence.

378 Md. at 79, 835 A.2d at 621 (internal quotation marks and citation omitted). Once a

plaintiff makes out a *prima facie* case in negligence, i.e., where he or she produces

"evidence that the violation of the statute proximately caused the plaintiff's injury," such

evidence is sufficient so as to "'warrant the court in submitting the case to the jury on the

question of the [defendant's] negligence.'"[12]  *Id.* (alterations added in *Brooks*) (quoting

---

[12] In several other jurisdictions, plaintiffs in lead paint poisoning negligence
actions are required additionally to adduce evidence that the tort defendant had
knowledge that he or she violated the statute. In Maryland, however, *Brooks* makes clear
that "once it is established that there was a statutory violation, the tort defendant's

Continued…

*Crunkilton v. Hook*, 185 Md. 1, 4, 42 A.2d 517, 519 (1945)).  Then, "[t]he trier of fact

must . . . evaluate whether the actions taken by the defendant were reasonable under all

the circumstances."  *Id.* (citations omitted).[13]

In the present cases, the plaintiffs relied upon violations of the City Housing

Code[14] to establish the landlord's or homeowner's *prima facie* negligence.  In *Brooks*, we

summarized that, to establish a *prima facie* negligence case for lead-paint poisoning

based on violation of the Housing Code, a plaintiff must show that there was flaking,

loose, or peeling paint:

> In sum, the presence of flaking, loose, or peeling paint is a violation of the
> Housing Code.  *Brown v. Dermer*, 357 Md. at 361, 744 A.2d at 56-57 ("To
> be a violation, all that must be shown is that there was flaking, loose or
> peeling paint").  As earlier pointed out, certain provisions of the Housing
> Code were clearly enacted to prevent lead poisoning in children.  Therefore,
> the plaintiff . . . is in the class of people intended to be protected by the
> Housing Code, and his injury, lead poisoning, is the kind of injury intended
> to be prevented by the Code.  This is all that the plaintiffs must show to
> establish a *prima facie* case sounding in negligence.  Therefore, the notices
> of violation issued to Lewin Realty by the Department of Housing for

---

Cont'd

knowledge that he or she violated the statute is not part of the tort plaintiff's burden of
proof.  **It is the violation of the statute or ordinance alone which is evidence of
negligence**."  *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 80, 835 A.2d 616, 622 (2003)
(emphasis added).

[13] In this sense, contrary to the contentions of the Respondents in *Alston*, *prima
facie* negligence differs from strict liability, which does not permit a defendant to explain
how his actions were reasonable.

[14] Specifically, as noted earlier in this opinion, the plaintiffs relied on Housing
Code, Baltimore City Code (2000 Repl. Vol.), Art. 13, § 702, 703, & 706. *See supra* note
2.

unrelated properties were irrelevant and there should be a new trial as directed by the Court of Special Appeals.

378 Md. at 89, 835 A.2d at 627 (footnote omitted).

Although peeling, chipping, or flaking paint (of any kind) constitutes a violation of the Housing Code, such a Code violation permits merely an inference of *prima facie* negligence on the part of the homeowner or landlord. Such an inference, however, does not eliminate the requirement that the plaintiff prove that the landlord's negligence *caused proximately* the injury. As the Court of Special Appeals explained in *Hamilton v. Dackman*, 213 Md. App. 589, 613, 75 A.3d 327, 340-41 (2013) (hereinafter, "*Raymond Hamilton*"), "although the Court of Appeals suggested in *Brooks* that a statutory violation may constitute a *prima facie* case of negligence, 378 Md. at 79, 835 A.2d 616, that holding does not relieve a plaintiff of the obligation to establish causation." More specifically, the intermediate appellate court stated:

> *Brooks* eliminated notice of a lead-paint violation as *one element* of a negligence claim. 378 Md. at 72, 835 A.2d 616. The Court of Appeals explained that the plaintiffs did not have to provide notice and could submit their claim to the jury without proving that the landlord had notice "*if* the plaintiffs can establish a violation of the Housing Code *which proximately caused* [plaintiff's] injuries." *Id.* at 81, 835 A.2d 616 (emphasis added). This meant, in *Brooks,* that where a child had been seen chewing repeatedly on a windowsill in a home that upon later inspection specifically was found to contain lead-based paint, *id.* at 73–74, 835 A.2d 616 (and whom the record did not reflect lived or visited any property other than the one that was the subject of the litigation), she could submit her case to the jury without having to show that the defendant had notice of the condition. *Id.* at 72, 835 A.2d 616; *see also Polakoff v. Turner,* 385 Md. 467, 483, 869 A.2d 837 (2005) (permitting the plaintiff to submit her case to the jury if she "could establish a violation of the Code *which proximately caused* her injuries" (emphasis added)).

*Raymond Hamilton*, 213 Md. App. at 613, 75 A.3d at 341 (emphasis added in original).

In the present cases, because we elect to resolve the cases on the issue of causation, we accept the premise that the subject properties were afflicted with peeling, chipping, or flaking paint. Accepting such premise, the Hamiltons and the Alstons made out *prima facie* cases that the defendants—the owners and/or landlords of the residences—committed negligent acts in violation of the Housing Code. Thus, we address what quality or quantum of circumstantial evidence of causation is sufficient to make out a *prima facie* showing for that element of the negligence case.

### A. Causation Analysis in Maryland Lead Paint Cases

"It is fundamental that in a negligence action the plaintiff has the burden of proving all the facts essential to constitute the cause of action." *Peterson v. Underwood*, 258 Md. 9, 15, 264 A.2d 851, 854 (1970). One element of a negligence case is that the defendant's negligence was a proximate cause of the accident or injury. *See, e.g.*, *Raymond Hamilton*, 213 Md. App. at 613, 75 A.3d at 341. The inquiry here focuses on "causation in fact," one aspect of proximate cause, "concerned with the more fundamental (and some have thought metaphysical) inquiry of whether defendant's conduct actually produced an injury." *Peterson*, 258 Md. at 16-17, 264 A.2d at 855.

We have recognized repeatedly that a plaintiff may prove causation in fact through circumstantial evidence, as well as direct evidence or a mixture of the two. For example, in *Peterson*, the Court stated:

> If lay testimony together with reasonable inferences does not directly show this causal relation (such as a witness's observing a brick hurled through a plate glass window) it may be shown in a number of other ways. The most familiar method today is through the opinion of the expert who states that, based on facts in evidence, X was the efficient cause of the injury. Such

-24-

opinion testimony is not always required, and the plaintiff produces legally sufficient proof to get to the jury once he shows it is more probable than not that defendant's act caused his injury. This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover. The situation before us is somewhat analogous, except that instead of showing two evenly balanced probable causes, plaintiff has shown none.

In the trial below plaintiff apparently relied on an inference that defendants' acts were the cause or proximate cause of the injury. An 'inference' is a deduction or conclusion which reason and common sense lead a jury to draw from the facts proved. *United States v. Schneiderman*, 106 F. Supp. 906, 928 (S. D. Cal. 1952), cf. 21 Words and Phrases, 'inference' (1960). **This attempted reliance amounts to proof of causation by circumstantial rather than direct evidence.** In accordance with the general rules stated above, **this type of evidence is not inherently insufficient; all that is necessary is that it amount to a reasonable likelihood or probability rather than a possibility.**

258 Md. at 17, 264 A.2d at 855 (emphasis added) (some internal citations omitted).

When a plaintiff does not offer a direct explanation of the cause of the injury or accident, a plaintiff is "compelled to rely entirely on the inference." *Peterson*, 258 Md. at 18-19, 264 A.2d at 856. The validity of an inference "depends on commonly experienced relationships of acts and forces," *id.*, 258 Md. at 18, 264 A.2d at 856, or "depends on logical deduction from an established fact." *Id.*, 258 Md. at 19, 264 A.2d at 856. Certain sets of facts may make an inference less valid than other sets of facts. *See, e.g.*, *id.*, 258 Md. at 21, 264 A.2d at 857 (concluding that the passage of time between the negligent act and the injury rendered the inference of causation illogical and thus concluded that the trial court's granting of summary judgment was proper). The conclusion that an inference is not valid due to a lack of supporting facts or an articulable logical relationship does not mean that we place greater weight on direct evidence than on

-25-

circumstantial evidence. Rather, it means that we require inferences to be sound logically, and we refuse to allow a jury of laymen to engage in "'guesswork, speculation and conjecture.'" *Id.*, 258 Md. at 21, 264 A.2d at 857 (quoting *Wilhelm v. State Traffic Safety Comm.*, 230 Md. 91, 101, 185 A.2d 715, 719 (1962)).

In the context of lead paint cases, this Court's next most recent decision on causation is *Ross v. Housing Authority of Baltimore City*, 430 Md. 648, 63 A.3d 1 (2013). In *Ross*, the Court recognized aptly that, in the typical lead-paint case,[15] the theory of causation has multiple analytical layers:

> The theory of causation presented in this case can be conceived of as a series of links: (1) **the link between the defendant's property and the plaintiff's exposure to lead**; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing Ms. Ross' alleged injuries, the Payson Street home must have been a source of Ms. Ross' exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.

*Ross*, 430 Md. at 668, 63 A.3d at 12-13 (emphasis added) (footnote omitted). In the present cases, we are concerned with the first link. To prove this link, circumstantial evidence may be used, "so long as it creates 'a reasonable likelihood or probability rather

---

[15] In reiterating this multi-level causation approach, we repeat also the admonition in *Ross*: "We do not mean to rule out the possibility of other ways that a plaintiff might demonstrate that lead exposure is a substantial factor in a resulting harm to an individual." 430 Md. at 668 n.20, 63 A.3d at 13 n.20. In these consolidated cases, however, both sets of plaintiffs relied on the same causation theory as in *Ross*. Thus, we do not dwell on hypotheticals beyond those deemed necessary to clarify or illuminate the law.

than a possibility' supporting a 'rational inference of causation,' and is not 'wholly speculative.'" *West*, 212 Md. App. at 170-71, 66 A.3d at 1150 (citations omitted). The Hamiltons' and Alstons' cases hinge on that fine distinction between circumstantial evidence that amounts to a reasonable likelihood or probability and circumstantial evidence that amounts only to a possibility and speculation.

To connect the dots between a defendant's property and a plaintiff's exposure to lead, the plaintiff must tender facts admissible in evidence that, if believed, establish two separate inferences: (1) that the property contained lead-based paint, and (2) that the lead-based paint at the subject property was a substantial contributor to the victim's exposure to lead. At times, these separate inferences may be drawn from the same set of facts, but parties would do well to remember that these inferences are separate and often will require different evidentiary support.

In an effort to contribute to clarification of any confusion, we consider first *Dow v. L & R Properties Inc.*, 144 Md. App. 67, 796 A.2d 139 (2002), which represents a scenario where multiple inferences seek to draw succor from the same factual reservoir:

> In [*Dow*], a child and her mother sued their landlord for injuries the child allegedly suffered as a result of ingesting lead paint in their home. The discovery materials and an affidavit of the mother indicated that the home had been built prior to 1950 and thus likely had lead paint, that there was chipping and peeling paint in areas where the child played and that the child placed paint chips in her mouth, that the child spent most of her time in the home while she lived there and did not have contact with other sources of lead during that period, and that the child developed lead poisoning.
>
> The landlord in *Dow* moved for summary judgment, arguing that (1) the plaintiff had not identified an expert who would testify that there was lead paint on the premises and (2) there was no other direct evidence that the

paint contained lead. As a result, the landlord argued, there was insufficient evidence to prove causation and the landlord was entitled to judgment as a matter of law. The Court of Special Appeals rejected that argument and concluded that the circumstantial evidence was sufficient to generate a genuine issue of material fact and thus defeat the landlord's motion for summary judgment. 144 Md. App. at 74–75, 796 A.2d 139. The court reasoned that it was not necessary for the plaintiff to prove causation by direct evidence; circumstantial evidence that "amounts to a reasonable likelihood or probability rather than a possibility" would suffice. *Id.* (quoting *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970)). The court held that evidence offered by the plaintiff in opposition to the motion, if believed by the fact-finder, could support an inference that the property was the only possible source of the child's lead poisoning. *Id.* at 76, 796 A.2d 139.

*Ross*, 430 Md. at 669-70, 63 A.3d at 13 (summarizing *Dow*).

In sum, the facts in *Dow* showed that (1) the child victim spent most of her time at the subject property where she lived and did not have contact with other possible sources of lead during the relevant period; (2) the child was observed ingesting regularly flaking or chipping paint at that property; (3) the child played frequently in the area of the flaking or chipping paint; and (4) the child had high blood lead levels during that time period, i.e., developed lead poisoning. The court concluded that, under those circumstances, there was more than a mere possibility that the house where the child resided *and spent most of her time* was the *only* possible source of the lead exposure. As such, because the child spent almost all of her time at the house, the court concluded additionally that it was more than a mere possibility that the house contained lead-based paint. Even though there was no direct evidence of lead at that property, i.e., no scientific testing, it was reasonable to infer that there had to be lead at that property because the child would not have suffered otherwise from lead poisoning. In that sense, the plaintiff eliminated all

-28-

other possible sources of lead poisoning in order to make reasonable and probable those conclusions. Thus, the court drew two necessary, separate inferences on the basis of the same set of facts.

In a very instructive case, *Ross*, this Court found, in reviewing the grant of summary judgment in favor of defendants, that a reasonable inference would be "that the lead investigation reports for the [plaintiffs'] home accurately identified lead on the property." 430 Md. at 670, 63 A.3d at 14. The *Ross* Court detailed the facts supporting this inference:

> The 1992 inspection returned positive results for exterior lead as well as "surface dust" on the interior. The 1994 inspection again indicated the presence of lead on exterior walls. The only direct evidence of an indoor source of lead was the 2009 ARC [E]nvironmental survey that indicated the presence of lead on an interior stair riser, though it is not indicated in the record whether that location was tested earlier or whether it was in a deteriorating condition in the early 1990s.

*Ross*, 430 Md. at 671 n.23, 63 A.3d at 14 n.23.[16] As such, *Ross* and *Dow* are examples of cases with sufficient circumstantial evidence for the drawing of separate and reasonable inferences of the presence of lead at the subject property.

---

[16] In *Ross*, the Circuit Court refused to let the case go to the fact-finder in the absence of an expert's admissible testimony. We held, however, that an expert was not necessary to connect the dots between the lead on the property and the child's exposure to lead and, therefore, remanded the case to the Circuit Court. We cautioned:

> [I]t may well be that, once the parties have marshaled the evidence without the expert opinion on source, it is clear which facts are disputed and which are not, and the limits of the inferences in plaintiff's favor are evident, summary judgment might still be warranted.

Continued…

The present cases, in contrast, lack the same or similar quality of circumstantial evidence undergirding the desired inferences. Despite this difference, Plaintiffs here cling to the same theory of causation advanced by the plaintiffs in *Dow*. Specifically, Plaintiffs ask this Court to permit a fact-finder to draw multiple inferences from a singular group of facts, even though Plaintiffs failed to exclude other potential sources of lead in these cases. Moreover, Plaintiffs declined to use seemingly available judicial methods[17] for testing the interior of the houses.[18] We have yet to address this scenario,

---

Cont'd

*Ross*, 430 Md. at 671, 63 A.3d at 14.

[17] For example, where a defendant owns still the subject property, Md. Rule 2-422(a) supplies a mechanism for the inspection and testing of the property for the presence of lead-based paint, providing in pertinent part: "[a]ny party may serve one or more requests to any other party . . . (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection, measuring, surveying, photographing, testing, or sampling the property . . . ." *See also Butler v. S & S P'ship*, 435 Md. 635, 645-49, 80 A.3d 298, 305-07 (2013) (discussing the application of this Rule in-depth).

In contrast, though, in those lead-paint cases in which the defendant is a former owner and a different person or entity owns the subject property at the time of the litigation, such as the present cases, the plaintiffs may not avail themselves of Md. Rule 2-422. *See Webb v. Joyce Real Estate, Inc.*, 108 Md. App. 512, 517 n.2, 672 A.2d 660, 662 n.2 (1996) (concluding that Md. Rule 2-422 did not authorize entry onto property owned by a nonparty because, under Rule 2-422, "nonparties may not be compelled to submit to an inspection of their property"). The Court of Special Appeals made clear in *Stokes v. 835 N. Washington Street, LLC*, 141 Md. App. 214, 784 A.2d 1142 (2001), however, that a plaintiff so situated may have other judicial avenues through which he or she may seek testing of the interior of a house owned by a non-party.

In *Stokes*, the defendant was the former owner of the subject property. The current owner of that property refused the plaintiffs' request for access to that property in order to conduct a test for the presence of lead-based paint. The plaintiffs filed an action against the current owner, seeking an order for entry upon the property to conduct a

Continued…

-30-

but the Court of Special Appeals addressed it in *West v. Rochkind*, 212 Md. App. 164, 66 A.3d 1145 (2013), and *Hamilton v. Dackman*, 213 Md. App. 589, 75 A.3d 327 (2013). We consider those cases now.

---

Cont'd

"noninvasive and nondestructive test" on the paint in the interior of the residence. The Circuit Court denied that motion. Plaintiffs appealed.

The Court of Special Appeals recognized that the plaintiffs were not permitted under Md. Rule 2-422 to enter onto the property owned by a non-party, and that no other Maryland rule provided explicitly for the circuit court to grant such relief. Despite the absence of a rule, however, the court held that the plaintiffs were permitted to request such relief from the circuit court, and "the circuit courts have the power to order inspection of a non-party's property on a case-by-case basis through the equitable bill of discovery." *Stokes*, 141 Md. App. at 221, 784 A.2d at 1146-47. The intermediate appellate court reasoned that "the absence of a rule expressly authorizing an inspection does not preclude the circuit court from granting that relief when it is in the interest of justice to do so." *Id.*, 141 Md. App. at 222, 784 A.2d at 1147-48.

[18] We recognize that practical difficulties may preclude a plaintiff from testing the interior of a dwelling, particularly if the home has been razed since the victim ceased living there. In the present cases, however, we have no evidence of any grave difficulty that would have precluded Plaintiffs from obtaining testing. In *Alston*, there is no evidence that Plaintiffs made any attempt to test the exterior or the interior of the home alleged to be a source of Plaintiff's injuries. In *Hamilton*, Plaintiffs hired a lead investigator to test the relevant subject property. When the investigator arrived at the home, the current resident permitted the investigator to test only the exterior of the house, but would not permit him to enter for testing. Even in *Hamilton*, however, there is no evidence in the record that Plaintiffs attempted to use judicial devices to obtain testing of the interior.

We note the lack of direct evidence not because it is required *per se*. We note it in response to the Hamiltons' and the Alstons' arguments that to require more evidence than Plaintiffs presented in these cases is an "insurmountable burden" for lead-paint plaintiffs generally. Without evidence that Plaintiffs exhausted reasonable avenues to gather direct or circumstantial evidence of the presence of lead paint, we find it impossible to conclude that this standard is "insurmountable." Moreover, this Court acknowledged in many negligence cases that some cases simply do not have enough information to hold the defendant to trial. In this regard, an "insurmountable burden" is appropriate for cases that would leave the jury to guesswork and speculation.

-31-

In *West*, the plaintiff alleged that he sustained injuries from ingesting chipping and flaking paint while living with his grandmother in a property owned and leased out by the defendants. West's negligence claim was based on circumstantial evidence because the property, since razed, had not been the subject of lead testing. The defendants filed a motion for summary judgment, which the Circuit Court for Baltimore City granted, concluding that West failed to make out a *prima facie* negligence case because, unlike in *Dow*, West's mother stated during deposition that West either resided or spent substantial amounts of time at a variety of houses during the first six years of his life, during which he experienced lead poisoning. The Circuit Court reasoned that, in light of West's "uncertain residential history and the lack of any direct evidence that [the subject property owned by the defendants] ever contained lead paint, [West] could not point to [the subject property] as the source of his lead poisoning." *West*, 212 Md. App. at 166, 66 A.3d at 1146.

On appeal, the Court of Special Appeals agreed. The intermediate appellate court acknowledged that "[a] lead paint plaintiff may, of course, establish a prima facie case of negligence based solely on circumstantial evidence." *West*, 212 Md. App. at 175, 66 A.3d at 1151. For example, the court cited *Dow*, in which there was also no direct evidence that lead paint was present at the subject property. The court distinguished *Dow*, however, on the grounds that "the process of elimination showed ineluctably that [the subject property] had to have been (not could have been, but had to have been), a place containing lead paint." *Id.*, 212 Md. at 172, 66 A.3d at 1149. The *West* court explained:

The evidence showed indisputably that the only place where she could have been exposed to lead paint was at [the subject property]. There was only one possible cause for the undisputed effect [because deposition testimony indicated that the plaintiff did not live or spend substantial time at any other property]. By process of elimination, there was no other possible source of exposure. That, we held, constituted solid circumstantial evidence that the house contained lead paint . . . .

*Id.*, 212 Md. at 172, 66 A.3d at 1149-50.

That the facts in *Dow* permitted the court to derive two analytic steps from a singular set of facts, the *West* court cautioned, "should not obscure the fact that there was still involved a two-step analytic process, and that what may be said about one step in that analytic process does not necessarily apply to the other step." *West*, 212 Md. App. at 173, 66 A.3d at 1150. Reiterating, the necessary two-steps are (1) the plaintiff must show first that the subject property had lead-based paint, and (2) then the plaintiff must show that his or her exposure at the subject property "was an effective cause of his lead poisoning." *Id.* According to the *West* court, the second step, "[t]he proof of ultimate causation[,] does not demand exclusivity." *Id.* The first step, the proof that the subject property had lead paint, however, does demand exclusivity. *Id.*

Based on the distinction between the proof required to satisfy these two steps, the *West* court concluded that "where no direct evidence that [the subject property] even contained lead paint, [West] may only rely on that critical fact, as a necessary part of his circumstantial evidence, if he can show by the process of elimination that [the subject property] was the only possible cause for the critical effect of lead poisoning." *West*, 212 Md. App. at 175, 66 A.3d at 1151. In other words, "[the court] may only infer the existence of lead paint at [the subject property] from [West]'s condition if lead paint at

-33-

[the subject property] is shown to have been the only possible explanation for [West]'s condition." *Id.* To expound on this "subtle," "critical" distinction, the *West* court explained further:

> The distinction that Dominique [the victim] fails to grasp is a subtle one; it is nonetheless a critical one. In Dominique's forensic syllogism, his conclusion of ultimate liability does not, to be sure, depend upon the exclusivity of 1814 Lorman Street as a source of his lead poisoning. Lorman Street could readily share liability with two or three other places of exposure. That, however, is not the point. Before even getting to a syllogism's conclusion, one must first establish the premises out of which the conclusion arises. A necessary premise in this case is that there was, indeed, lead paint at 1814 Lorman Street. It is with respect to that antecedent premise, not with respect to the ultimate conclusion, that the lack of exclusivity is Dominique's Waterloo. It is the teaching of *Dow* that, even in the absence of direct proof, the presence of lead paint at a particular site can be inferred by the process of elimination, but only if we have 1) the effect of lead poisoning in the plaintiff and 2) the fact that the site in question was the exclusive possible source of the plaintiff's lead paint exposure. It was the truth of that premise that Dominique failed to establish in this case, not the validity of the conclusion proceeding from the premises. Exclusivity was not required at B. It was required at A, before one even gets to B.

*West*, 212 Md. App. at 175-76, 66 A.3d at 1151-52.

We agree with the *West* court's analysis for application to those cases where a plaintiff relies on a *Dow* theory of causation. Under a *Dow* theory of causation, a plaintiff must rule out other reasonably probable sources of lead exposure in order to prove that it is probable that the subject property contained lead-based paint. Where the plaintiff fails to rule out other reasonably probable sources, the necessary inferences for a *Dow* theory of causation cannot be drawn with sufficient validity to allow the claim to survive summary judgment. *See also Taylor*, 207 Md. App. at 136, 150, 51 A.3d at 752, 760-61 (concluding that the trial court granted aptly the defense motion for summary

judgment on the grounds that "[t]he evidence in this case does not come close to the kind of circumstantial evidence that the Court found sufficient in *Dow* and that . . . it's not simply the age of the house and even the peeling"). That certain facts are missing to establish a *Dow* theory of causation, however, does not mean that the lead-poisoned plaintiff has no way to prove circumstantially a *prima facie* negligence case. To the extent that *West* suggests that a lead-paint plaintiff must exclude all other sources of lead exposure in every instance of circumstantial proof, we do not agree necessarily with that conclusion.

A lead-paint poisoned plaintiff may prove circumstantially that the subject property contained lead-based paint in a number of ways. As discussed above, if a plaintiff is able to exclude other reasonably probable sources of lead, such as in *Dow*, then the plaintiff presents a *prima facie* case. By way of another example, consider this illustration representing a traditional short series of row houses in Baltimore:



**Row house "B"** = subject property that a plaintiff wishes to prove contains lead-based paint.

**Row house "A" and "C"** = properties that tested positive previously for lead on the interior

**Row house "D"** = unknown if property contains lead

In this hypothetical, row house "B" is the subject property (designated with the "X") that a plaintiff hopes to prove, through circumstantial evidence, contains lead-based paint. Perhaps the row house was razed, however, and direct testing is impossible at the time of

the litigation. There exists, however, evidence that these four row houses were built at the same time in the 1920's and that they were owned as a group by a series of persons or entities through the 1950's. Moreover, the City's records reveal that row houses "A" and "C" (designated with stripes) tested positive previously for lead paint on the interior of the houses. Thus, in this hypothetical (at least in the absence of evidence of lead abatement measures), the plaintiff is able to present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead-paint poisoning.[19]

Where a plaintiff who does not produce evidence to support another theory of causation and, instead, relies on a causation theory similar to that espoused in *Dow*, the validity of the necessary inference is limited to those circumstances where the plaintiff is able also to exclude other reasonably probable sources of lead exposure.

### B. Bridging the Inference Link with Expert Testimony

Plaintiffs in the present cases argue that their experts' testimony bridged any evidentiary gap in their circumstantial proof. Specifically, their experts opined that the subject properties were probably a substantial contributor to Plaintiffs' injuries.

The Court of Special Appeals addressed a similar contention in *Raymond Hamilton*, 213 Md. App. 589, 75 A.3d 327. In that case, the plaintiff lived at three leased dwellings: (1) a house on Gilmor Street from birth until 1993; (2) a house on Harlem Avenue from 1993 to 1995; and (3) a house on Fulton Avenue from 1995 to 1999. None

_____

[19] This illustration only forges one of the *Ross* links.

of those houses, however, was the subject of Raymond's claim of lead poisoning, but rather a property on Appleton Street, the home of the plaintiff's father, where the plaintiff visited often and stayed sometimes overnight.

During discovery in *Raymond Hamilton*, the plaintiff presented a report of the results of a technician's lead testing on eight exterior surfaces of the Appleton property. Of the eight areas tested, only one—the rear exterior door transom—tested positive for the presence of lead paint. Additionally, the plaintiff identified two experts: Dr. Robert K. Simon, Ph.D., a chemist and industrial hygienist (the same expert as appears in *Hamilton v. Kirson*), and Dr. Jacalyn Blackwell-White, M.D., a board-certified pediatrician (the same expert as appears in *Ross*, 430 Md. at 656, 63 A.3d at 5, as well as in *Hamilton v. Kirson*). The Court of Special Appeals described Dr. Simon's opinion as:

> [Dr. Simon] opined that the Appleton Street property was a source of [the plaintiff's] exposure to lead-based paint. He assumed from the age of the Appleton Street property that it contained lead-based paint (invoking Md. Code Regs. 26.16.01.03(A) (2013)).[20] When asked to describe the basis for his opinion that the Appleton Street property contained lead-based paint, Dr. Simon admitted that he assumed the presence of lead both there and at the Harlem Avenue property from the properties' age . . . .

*Raymond Hamilton*, 213 Md. App. at 595-96, 75 A.3d at 330.

Dr. Blackwell-White "opined that the Appleton Street, Harlem Avenue, and Fulton Avenue properties all were sources of lead-based paint and that [the plaintiff]'s

---

[20] The regulation provides: "The presence of a lead-containing substance is presumed in any residential building constructed before 1950 unless a person determines that all painted surfaces are lead-free in accordance with § B of this regulation." Md. Code Regs. 26.16.01.03(A) (2013).

injuries were caused by exposure at the sites . . . ." *Id.*, 213 Md. App. at 597, 75 A.3d at 331. She explained, in part: "Both properties [the Appleton Street and Harlem Avenue properties] were old and in the absence of physical lead assessment information, are presumed to have contained lead based paint." *Id.* During a deposition of Dr. Blackwell-White, defense counsel asked repeatedly whether Dr. Blackwell-White could rule out the other properties as a contributing source. Dr. Blackwell-White replied that she could not. When she was asked what was the basis of her opinion, she stated: "That [the Harlem Avenue property] too, was an older property in disrepair. And it was the property of residence when the elevated lead levels were found." *Id.*, 213 Md. App. at 600, 75 A.3d at 333.

Dackman moved for summary judgment, arguing (1) that the plaintiff "had failed to provide either direct or circumstantial evidence demonstrating the presence of lead at the Appleton Street property during the relevant time period, and (2) that he could not rule out other properties as potential sources." *Id.* In particular, "Dackman also claimed that because Raymond's experts admitted they were unable to rule out other sources of lead exposure or other properties as containing lead, they lacked an adequate factual basis to conclude that the Appleton Street property was *the* source of his lead exposure." *Id.*, 213 Md. App. at 600-01, 75 A.3d at 333 (emphasis in original).

> The plaintiff retorted that there was abundant evidence:
>
> He argued that the Arc Report's single positive test demonstrated he was exposed to lead at the Appleton Street property. And he claimed that this evidence coupled with the testimony of his experts established a *prima facie* case that the Appleton Street property was a 'substantial contributing factor' to his injuries because he was required only to show that 'he was,

> more likely than not, exposed to lead paint at a given subject property.' He argued that he was not required to prove only a single source of lead exposure or a single cause of his injuries.

*Id.*, 213 Md. App. at 601, 75 A.3d at 333. The Circuit Court granted the defense motion for summary judgment, holding that the plaintiff "had not produced evidence sufficient to establish a *prima facie* case of lead exposure at the one property at issue here, and the court declined to allow [the plaintiff's expert] to fill the causal gaps." *Id.*, 213 Md. App. at 591-92, 75 A.3d at 328.

On appeal, the Court of Special Appeals stated that "an expert cannot transform thin evidence or assumptions into viable causal connections simply by labeling them an expert opinion." *Id.*, 213 Md. App. at 608, 75 A.3d at 338; *see also Taylor v. Fishkind*, 207 Md. App. 121, 142, 51 A.3d 743, 756 (2012) ("'[a]n expert's opinion testimony must be based on [an] adequate factual basis so that it does not amount to conjecture, speculation, or incompetent evidence.'") (quoting *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 182-83, 831 A.2d 481 (2003) (alterations in original)). Moreover, the court stated that Maryland courts "have for some time required more of a plaintiff than simply a showing that he lived in an old house in an area where lead-based paint historically was present." *Raymond Hamilton*, 213 Md. App. at 612, 75 A.3d at 340; *see also id.* ("'[T]he mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency.'") (quoting *Davis v. Goodman*,

117 Md. App. 378, 393, 700 A.2d 798, 805 (1997)).[21] Thus, the court emphasized that "a plaintiff bears the burden to establish the presence of lead in the child's environment, and cannot just assume it merely from the age or location of the house." *Id.* In applying those principles to the experts' opinions in *Raymond Hamilton*, the Court of Special Appeals concluded that neither of the experts possessed the qualifications necessary, nor the factual basis, to render an opinion as to the source of the lead that the child ingested. Moreover, the court reasoned that, similar to *Ross*, because the expert "reached a conclusion as to the source notwithstanding the presence of other potential sources of lead, and as such her opinion 'was as likely to confuse as to assist a jury.'" *Id.* (quoting *Ross*, 430 Md. at 664, 63 A.3d at 10).

The intermediate appellate court held that, without the experts' testimonies, "the evidence proffered here would have allowed a jury at most to find a *possibility* that the circumstantially-established lead exposure at the Appleton Street property was a source of [the plaintiff's] alleged injuries. That is not enough: a plaintiff must establish . . . a *probability* that a property exposed him or her to injury-causing lead paint." *Id.*, 213 Md.

_____

[21] These statements in *Raymond Hamilton* and *Davis*—that the presence of lead paint cannot be determined based on the general area of an "old" house—were in response to the argument that the presence of lead paint should be presumed in all houses built in Baltimore City during certain time periods, in light of reports that indicate a high percentage of similarly situated houses contained lead paint. The court concluded aptly that the inference had an insufficient factual basis. In contrast, the hypothetical we presented earlier in this opinion at 35-36 differs in the type of factual basis upon which the inferences rely.

-40-

App. at 605, 75 A.3d at 336 (citing *Ross*, 430 Md. at 664, 63 A.3d at 10) (emphasis in original).

In sum, *Dow* does not define the only set of circumstantial facts that may satisfy a plaintiff's burden to establish a *prima facie* negligence case for lead paint poisoning. The pertinent question to be asked is whether the particular circumstantial evidence permits an inference or inferences of the desired ultimate fact or facts as a "reasonable likelihood or probability," and not a mere "possibility." To the extent that the Court of Special Appeals's opinions discussed in this opinion suggest that the only way to prove a *prima facie* negligence case circumstantially is to eliminate every other reasonable possibility as an alternative source, we do not agree with the exclusivity of such a conclusion. With this understanding and these principles in mind, we shall apply them to the present cases.

### C. Analysis

#### i. *Hamilton*

There was no direct evidence adduced of lead-based paint in the interior of 754 Bartlett Avenue. Moreover, there was no evidence, as there was in *Dow*, that the children spent substantially all of their time in one house, the subject property, such that the Circuit Court could conclude that a fact-finder could be persuaded that there was a reasonable probability that the subject property contained lead-based paint. The Court of Special Appeals, in an unreported opinion, emphasized that, in order to prove a *prima facie* case, "the evidence . . . would have had to provide the experts with enough information to rule out other possible sources of lead exposure to create the circumstantial evidence that the Hamiltons were exposed to lead at the Bartlett house."

*Hamilton*, slip op. at 21. The intermediate appellate court held that the evidence in the

Hamiltons' case did not do so:

> Here, the Hamiltons presented an Arc report regarding exterior surfaces, the mother's statements that the boys put paint chips in their mouths at the Bartlett house, the elevated blood levels, and the age of the house. This evidence suggests, but is not sufficient to create a genuine dispute as to whether the Bartlett address contained lead paint unless the Bartlett property was the only place where the Hamiltons could have been exposed to lead paint. . . . Dr. Blackwell-White and Dr. Simon conceded that . . . two [other visiting] properties could not be ruled out as potential sources because there was some information that suggested they contained lead, and Dr. Simon specifically stated that the time spent at those houses increased the possibility of lead exposure.

*Id.* at 20-21. In so holding, the court acknowledged that "more than one home can be a

substantial contributing source of lead and therefore, more than one landowner could be

liable for a child's lead poisoning." *Id.* at 21. The court went on, though, stating:

> However, the underlying assumption in that statement is that both houses had the potential to cause injury because they actually contained lead. Based on our case law, to even enter the realm of 'substantial contributing source,' **a house has to be shown to have had lead-based paint - - almost invariably in the interior of the building**. Without direct evidence that the Bartlett house contained lead, **the Hamiltons' only option was to eliminate other sources of lead poisoning, not to establish that the only place responsible for the Hamiltons' lead poisoning was the Bartlett house, but to show that the Bartlett house contained lead.** However, neither of Hamiltons' experts could eliminate the other potential sources of lead. In fact, they were provided with little information on those other potential sources.

*Id.* at 21-22 (emphasis added).

The Court of Special Appeals recognized aptly the multi-layered nature of the

causation analysis in circumstantial evidence cases. The court stated that the Hamiltons

were not required "to establish that the only place responsible for the Hamiltons' lead

-42-

poisoning was the Bartlett house, but [were required] to show that the Bartlett house contained lead." *Id.* at 21. We depart from the reasoning of the intermediate appellate court, however, that, without direct evidence, "the Hamiltons' only option was to eliminate other sources of lead poisoning." *Id.* As we discussed above at 35-36 in our hypothetical of the block of row houses, there may be other ways that an injured plaintiff may establish that it was probable that the interior of a subject house contained lead. Accordingly, the sole concern should not be that the Hamiltons' experts were provided with little information on other potential sources of lead exposure. Rather, the concern should be that the Hamiltons' experts reached the conclusion that the house contained lead-based paint on a presumption that houses built during a certain time period contain typically lead-based paint. Such a factual basis is insufficient for an expert to reach the conclusion that the interior of a specific property contained lead-based paint during the relevant time period.

### ii. *Alston*

In *Alston*, at the end of the motions hearing, the Circuit Court concluded that the defense motion for summary judgment should not be granted on the basis of uncertainty over where Plaintiffs lived, even though there was very little evidence and that which was adduced was "extremely sketchy in this case." Instead, the judge granted the defendant's motion for summary judgment on the basis of a failure to offer sufficient proof of causation linking the plaintiff's elevated blood lead levels and the specific conditions of the subject properties. The Circuit Court's reasoning is important to our (and its) analysis and, thus, we expound further.

-43-

The Circuit Court accepted that Plaintiffs showed that the subject properties had "deteriorating paint" and that, at least for purposes of the summary judgment motion, Plaintiffs "exhibited elevated blood lead levels at around the time that they say they were living in these properties." Moreover, the Circuit Court acknowledged correctly that generally Plaintiffs could prove a causal link "indirectly by circumstantial means." The Circuit Court concluded, however, that the plaintiffs failed to forge the first inferential link because:

> I think the essential logical ingredient that must be present in order for *Dow* or a theory like *Dow* to apply is that logically there must be a -- **a very strong conclusion that the lead [poisoning] that the plaintiffs were experiencing had to come from this source because there is no other logical source that is available**.

(Emphasis added.) The Circuit Court stated on the record that "there may be a number of ways that could be done" and then provided several examples:

> I've suggested one of them would be if there were visitation properties, that there is some evidence that tends to exclude those. There might be evidence that the paint wasn't deteriorating in those. There might be evidence that they were built after a period when lead paint was likely present. [sic] There might be evidence that the visits were very short, were supervised closely and the children didn't ingest paint. There may be a number of bases that might be advanced by plaintiff.

The problem, the Circuit Court stated, was that "you simply have two wide open possible properties at the same time, either of which could have been the source of the lead that is alleged. And that is insufficient to establish the *prima facie* case that the plaintiff would have to show on negligence."

On appeal, the Alstons argue that this analysis was defective. We disagree. Plaintiffs bear the initial burden of proving circumstantially a *prima facie* negligence

-44-

case. Part of that burden is to advance a viable theory of causation. In the Alstons' case, they argued a *Dow* theory of causation, but, as the Circuit Court noted, the Alstons failed to produce the quantum or quality of evidence noted in *Dow*, namely, they failed to eliminate other reasonably possible identified sources of lead exposure. Thus, the Circuit Court's comparison of the Alstons' case to *Dow* was appropriate and its ultimate conclusion that the Alstons' failed to meet their initial burden was correct.

**JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS IN THEIR RESPECTIVE APPEALS.**