*Jakeem Roy v. Sandra B. Dackman, et al*, No. 6, September Term, 2015. Opinion by Harrell, J.

**Appeal and Error – Extent of Review Dependent on Nature of Decision Appealed From**

The typical standard for appellate review of a grant of summary judgment is whether the circuit court was legally correct, with the circuit court's ruling being granted no deference.

**Appeal and Error – Extent of Review – Dual Nature of Proceedings**

When the circuit court's ruling excludes a proffered expert witness for the Plaintiff and that ruling results in the grant of summary judgment for the Defendant, our appellate review is dependent on the nature of the decision from which that the party appeals. In this instance, Petitioner appeals the exclusion of an expert witness as unqualified, requiring our review to be whether the circuit court abused its discretion.

**Evidence – Expert Witness – Qualifications – Medical Testimony**

In a child lead poisoning case, a board-certified pediatrician with 20 years-experience is qualified under Md. Rule 5-702 to testify as an expert witness as to medical causation.

**Evidence – Expert Witness – Qualifications –Source of Exposure**

Board-certified pediatrician lacked the requisite qualifications and an adequate factual basis to opine as an expert witness as to the source of lead exposure when relying solely on circumstantial evidence.

Circuit Court for Baltimore City
Case No. 24-C-11-004528
Argued: September 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 6

SEPTEMBER TERM, 2015

---

JAKEEM ROY

v.

SANDRA B. DACKMAN, ET AL

---

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Harrell, Glenn T., Jr. (Retired, Specially
                                Assigned),
Wilner, Alan, M. (Retired, Specially
                                Assigned),

JJ.

---

Opinion by Harrell, J.,
Battaglia and McDonald, JJ., dissent.

---

Filed:   October 16, 2015

"Expert, Texpert . . .
Don't you think the joker laughs at you . . ."

"I Am the Walrus" from the
Beatles' "Magical Mystery Tour"
Album (1967)

Perhaps the Beatles were expressing skepticism about self-styled experts and their

opinions or just singing nonsense lyrics.  Courts do not have the luxury to be ambiguous

about such things.  They are called upon frequently to assess the qualifications of

proffered expert witnesses and the worthiness of their proposed opinion testimony as

potential aids to fact-finders.  This is important especially in complex civil litigation

where medical causation is in dispute.[1]  With roughly equal frequency, Maryland's

appellate courts have had recently many opportunities to confront evidentiary questions

---

[1] In more than a nod towards preparing its judges for tackling evidentiary questions involving complex medical, scientific and business technology, the Maryland Judiciary invested over the last several years in training up a cadre of jurists (across all court tiers) in such matters. In 2004, the judiciaries of Maryland and Ohio created the Advanced Science and Technology Adjudication Resource Center (ASTAR) project, a program that grew in to a national program.  ASTAR was established to "train sitting judges in case-related science and technology [which] featured 120 hours in programs to refresh judges' long-dormant science backgrounds."  G.T. Harrell, Jr., et al., *Deployment of Science and Technology Trained Judges: Settling on a Plan*, Advanced Science and Technology Adjudication Center, Washington, DC, December 18, 2009.  Partnering with some of the country's well-known science centers including The Johns Hopkins University School of Medicine and the National Center for Science Education, ASTAR's curriculum provided participants with a vast array of programs to train sitting trial and appellate judges in complex medical and scientific evidentiary issues.  ASTAR is now known as the National Courts and Sciences Institute.  In addition, the Maryland Judiciary created a special litigation track in its differentiated case management system for complex business and technology cases. *See* Md. Rule 16-205.  The Maryland Judicial Institute, the continuing education vehicle for judges, trains designated judges for such service across the State.

involving proffered novel science/medical expertise and methodology in *Frye/Reed*

contexts[2] or where qualifications or the basis to testify were challenged in non-novel

contexts.[3]

---

[2] *See Dixon v. Ford Motor Co.*, 433 Md. 137, 149-50, 70 A.3d 328, 335 (2013) ("A *Frye/Reed* analysis is required, as a prerequisite to the application of Rule 5–702, only when the proposed expert testimony involves a 'novel scientific method,' in which event there must be some assurance that the novel method has gained general acceptance within the relevant scientific community.). In *Blackwell v. Wyeth*, 408 Md. 575, 608, 971 A.2d 235, 255 (2009), this Court explained that the *Frye/Reed* analysis was necessary for medical testimony in order to "avoid the pitfalls of an 'analytical gap.'" The *Frye/Reed* test required "[g]enerally accepted methodology, therefore, [to] be coupled with generally accepted analysis." *Id.* In another case, an expert witness's "methodologies used for diagnosis and theories regarding the causal connection between mold exposure and certain human health effects" was subject to *Frye/Reed* analysis because it was unclear if the methodology was generally accepted in the scientific community. *Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 336, 923 A.2d 939, 951 (2007).

[3] *See generally Exxon Mobil Corp. v. Ford*, 433 Md. 426, 478, 71 A.3d 105, 136 *as supplemented on denial of reconsideration,* 433 Md. 493, 71 A.3d 144 (2013) (explaining that an expert witness's conclusions must be supported by sufficient facts and a reliable methodology so that the "opinion constitutes more than mere speculation or conjecture"). Even in the context of foster care, we considered expert witness testimony as it related to the admission of a social worker's testimony:

> These statements are not only speculative, but amount to a lay diagnosis or prognosis regarding a complex medical issue. [The social worker] is not qualified to do that, as she was not qualified as a psychiatrist, psychologist, or licensed clinical social worker. The testimony was improper and should have been stricken.

*In re Yve S.*, 373 Md. 551, 615-16, 819 A.2d 1030, 1068 (2003). Additionally, we confronted the question of expert witness qualification "when 'complex medical issue[s]' or diagnoses are in question [and] required a specificity of knowledge, skill, experience, training, or education for qualification." *Blackwell*, 408 Md. at 623, 971 A.2d at 264. We concluded in that case that specialization was not required in order to be qualified as an expert witness "when we were presented with the expert's ability to perform an *accepted* technique." *Blackwell*, 408 Md. at 627, 971 A.2d at 266.

The present case falls in the latter category of challenge. Here, we are confronted with a proffered medical expert who proposed to opine as to the medical causation of deleterious effects from the ingestion of lead-containing paint chips or flakes by a young child *and* the source of those chips/flakes in or about a specific rental dwelling in downtown Baltimore where the child had resided with his mother. As to medical causation regarding the effects of lead-containing paint ingestion by children generally and the specific child in the present case, the landlord Respondent maintains that the nuances of opining as to medical causation depends critically on such matters as amount and duration of consumption and the development age of the victim at the relevant times, matters of "rigorous" debate within the relevant medical/scientific community and its literature. On these subjects, Respondent sees the Petitioner/victim's expert as ill-suited to offer an opinion that would be of assistance to a fact-finder. Clearly, such matters are not topics of common knowledge of lay people, who would populate most likely the jury in this case. Whether a pediatrician, who has never treated a child victim of lead paint poisoning, but claims to have read the relevant medical literature (or some representative and meaningful portion of it), should be permitted to offer an opinion as to medical causation that would be of some benefit to a lay fact-finder is what we shall decide essentially.[4]

---

[4] Whether it was proper to exclude the same witness's proffered testimony as to the specific source of the lead paint ingested allegedly by the victim is a much less close question. Even were it proper on this record to have excluded this testimony, it would not have been fatal necessarily to Petitioner proceeding to trial. On the other hand,

(Continued…)

3

# I.

Jakeem Roy, Petitioner, through his mother, Latisha Hillery, filed suit in negligence in the Circuit Court for Baltimore City against the landlord and owners (collectively "Respondents" or "Dackman") of a dwelling at 2525 Oswego Avenue, Baltimore, for alleged personal injuries resulting from lead-based paint poisoning. The Oswego Avenue property was alleged to be the only source of lead paint ingested by the child. After discovery, Petitioner identified two expert witnesses to testify both as to the source of his lead exposure, but only one of them as to the medical causation of the injuries suffered by Roy. Respondents filed motions to exclude Petitioner's expert witnesses on the basis that, under Maryland Rule 5-702, the experts were not qualified and, if their testimony was excluded, for summary judgment. The Circuit Court granted ultimately summary judgment in favor of Respondent. Without the testimony of Roy's sole medical expert to establish causation, the Circuit Court reasoned that Petitioner could not move to trial on circumstantial evidence alone and, thus, there was no genuine dispute of material fact and Respondent was entitled to judgment as a matter of law. After affirmance of this judgment by the Court of Special Appeals on Petitioner's direct appeal, we granted Roy's petition for a writ of certiorari to consider again what requirements must be met by an expert witness in order to qualify to testify principally as to the medical causation of alleged injuries from childhood lead exposure.

---

(…continued)
exclusion of the witness's medical causation testimony would be fatal to maintenance of the suit, for reasons we shall explain.

**Background**

Jakeem Roy, Petitioner (Plaintiff below), was born on 29 April 1996 in Baltimore City. For the first eight months of his life, Roy resided at 2801 Virginia Avenue in the City. Thereafter, Roy, his mother, and his siblings moved to 2525 Oswego Avenue and resided there from approximately the Fall of 1996 through November 1998.[5] During this time, 2525 Oswego Avenue, built originally in 1920, was owned and managed by Respondents (Defendants below). Roy, his mother, and his siblings moved from the subject property in November 1998 due to consequential damage from a house fire that occurred in an abutting dwelling.

On 29 June 2011, Roy filed suit in the Circuit Court against Sandra Dackman, individually and as trustee of the assets of Jacob Dackman & Sons, LLC ("the Dackmans"), alleging that the Dackmans provided negligently premises for rent that contained chipping, peeling, and flaking lead paint, in violation of the Baltimore City Housing Code ("Housing Code"), which paint debris was ingested by Roy while living at 2525 Oswego Avenue from 1997-1998. Roy alleged further in his complaint that the Dackmans' awareness of the conditions at 2525 Oswego Avenue was a direct violation of their duty of care to ensure that the property was safe and habitable for tenants. As a result of this alleged exposure at 2525 Oswego Avenue, Roy suffered lead poisoning and permanent injuries. The complaint pleaded multiple counts, including negligence and

---

[5] As noted by the Court of Special Appeals, the exact date that Roy moved to 2525 Oswego Avenue is not clear on the record. The parties' accounts to this Court are no more clear.

unfair and deceptive trade practices, in violation of the Maryland Consumer Protection Act, Maryland Code (1975, 2013 Repl. Vol.), Commercial Law § 13-303 ("CL").

In her deposition, Roy's mother, Latisha Hillery, testified that the Oswego Avenue property had flaking and chipping paint throughout the house on the floors, door frames, railings, cabinets, and window sills. On 14 September 2012, at the behest of Petitioner's counsel, the exterior of the property was tested by ARC Environmental, Inc.[6], resulting in positive readings for lead on eight of the nine locations tested. No test of the interior surfaces of the dwelling was conducted.[7] Between 1997 and 1999, Roy recorded elevated blood-lead levels while living at 2525 Oswego Avenue.[8] As noted in the record, Roy's blood-lead levels were measured as follows:

---

[6] ARC Environmental, Inc. is a lead inspection and testing company.

[7] At the time of the testing, the dwelling at 2525 Oswego Avenue was vacant and boarded up, which prevented effectively testing of the interior conditions. The record extract does not reveal what, if any, alternative methods may have been available to gain access to the interior thereafter.

[8] Blood-lead levels are expressed typically in micrograms per deciliter of whole blood (μg/dL). According to the U.S. Centers for Disease Control, any blood-lead level above 5 μg/dL is considered dangerous:

> If the reading is in the range 15–19 μg/dL, there should be additional screenings every three to four months, the child's family be counseled, and a detailed environmental history should be taken to identify sources of lead exposure. A child with a reading equal to or greater than 20 μg/dL should be referred for medical evaluation. A child with a reading of 45 μg/dL should receive urgent medical and environmental attention, while a reading of 70 μg/dL or more is considered a medical emergency.

*Ross v. Hous. Auth. of Baltimore City*, 430 Md. 648, 653 n. 4, 63 A.3d 1, 4 n.4 (2013).

| Sample Date | Blood Lead Level | Plaintiff's Residence |
| --- | --- | --- |
| 09/17/1997 | 15 µg/dL | 2525 Oswego Avenue |
| 11/19/1997 | 10 µg/dL | 2525 Oswego Avenue |
| 05/15/1998 | 10 µg/dL | 2525 Oswego Avenue |
| 12/07/1999 | 9 µg/dL | 3710 Haywood Avenue |

During discovery, Roy identified Dr. Eric Sundel, a board-certified pediatrician with 20 years in practice, and Robert K. Simon, Ph.D., an industrial hygienist and environmental lead risk assessor, as his anticipated expert witnesses to be called at trial. Dr. Sundel was retained by Petitioner to render opinions about the source of Roy's lead exposure and whether that exposure was the medical cause of Roy's claimed injuries. Dr. Sundel indicated that he would opine, relying on Roy's medical records and other reports, that lead-based paint at 2525 Oswego Avenue caused Roy's medical injuries, including a "loss of IQ points. . ., impaired attention, problems with memory, and problems with coordination."

To support his conclusion, Dr. Sundel relied on the following facts: (1) that the subject property where Roy resided from 8 months to 2 years of age was built in 1920; (2) Roy experienced elevated blood lead-levels while living at the subject property; (3) ARC's testing confirmed the presence of lead-based paint on the exterior of the dwelling; and (4) Roy's mother testified to the existence of chipping, flaking, and peeling paint within the house.[9] Dr. Sundel relied also on the in-person neuropsychological evaluation of Roy conducted by neuropsychologist Dr. Barry A. Hurwitz, Ph.D., to find that:

---

[9] At oral argument before this Court, Respondent claimed that there is a "robust argument" regarding the effects of lead poisoning on childhood development, seemingly

(Continued…)

Jakeem Roy had neuropsychological testing performed in January, 2012. His full-scale IQ was 78, which fell in the borderline impaired range of intellectual function. On motor function testing (ability to make the purposeful movements that are necessary to complete a task), his coordination was poor, and his scores on some of the other measures of motor function were extremely low to lower than expected. In terms of memory, his scores were borderline impaired on several different measures. Dr. Hurtwitz concluded that Jakeem "produced deficit performances on measure of attention, tactile perception, grapho-motor skills, motor tasks and memory that indicate brain-related neuropsychological impairments."

Combining these results with the other facts in the record and a review of relevant literature[10], Dr. Sundel concluded "[w]ith a reasonable degree of medical probability,

(…continued)

in an attempt to assert a *Frye/Reed, see Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978) (adopting standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)), basis for challenging Dr. Sundel's ability to testify as to lead causing certain neurological injuries. Respondent pressed this argument in the Circuit Court under the theory that Dr. Sundel's methodology was not reliable because Respondent alleged his method of determining IQ loss was "sheer speculation."

"Under the *Frye/Reed* standard, an expert opinion must be based on a scientific method or principle that has gained general acceptance in the relevant scientific community." *Ross*, 430 Md. at 660 n. 10, 63 A.3d at 8 n.10 (2013) (citation omitted). It is clear from the extensive medical/scientific research on the effects of lead paint exposure on children that expert opinions relating to this topic do not trigger generally the need for a *Frye/Reed* hearing and analysis. *See Reed*, 283 Md. at 380, 391 A.2d at 367 ("[T]he validity and reliability of a scientific technique may be so broadly and generally accepted in the scientific community that a trial court may take judicial notice of its reliability. Such is commonly the case today with regard to ballistics tests, fingerprint identification, blood tests, and the like."); *see also* Herbert L. Needleman et al., *The Long-Term Effects of Exposure to Low Doses of Lead in Childhood — An 11-Year Follow-up Report*, 322 New Eng. J. Med. 83 (1990). The present case is not about whether a *Frye-Reed* hearing was required.

[10] In an affidavit filed later with the Circuit Court, Dr. Sundel claimed to have reviewed publications containing peer-reviewed articles from the following: the American Academy of Pediatrics, the Centers for Disease Control and Prevention, Pediatrics, the New England Journal of Medicine, American Journal of Public Health, and the U.S.

(Continued…)

8

[that he] believe[d] Jakeem Roy suffered injuries from his lead exposure while residing at 2525 Oswego Avenue."

On 13 November 2012, Dr. Sundel was deposed at the behest of Respondent. His testimony established that he was well-read on the literature related to lead poisoning and its harmful effects on young children, but revealed that he had never studied or treated directly in his practice an individual with lead-based poisoning. Dr. Sundel did not examine Roy at any point during the litigation to that point. He claimed that it was not necessary to do so due to the documented evidence of Roy's neurological impairments adduced by Dr. Hurwitz after his personal evaluation of Roy.

Roy retained also Dr. Robert K. Simon, Ph.D., an industrial hygienist, who opined in a 2 June 2012 report that 2525 Oswego Avenue (owned by the Dackmans at the

---

(…continued)
Department of Health and Human Services. Some of the specific articles Dr. Sundel claimed to have reviewed in his prior reports include:

1. Bruce Lanphear et al., *Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis*, 113 Envtl. Health Perspectives 894 (July 2005).
2. David Bellinger, *Neurological and Behavioral Consequences of Childhood Lead Exposure*, 5 PLOS Medicine 690 (May 2008).
3. Herbert L. Needleman et al., *Deficits in psychologic and classroom performance of children with elevated dentine lead levels*, 300 New Eng. J. Med. 689 (1979).
4. Herbert L. Needleman et al., *The Long-Term Effects of Exposure to Low Doses of Lead in Childhood — An 11-Year Follow-up Report*, 322 New Eng. J. Med. 83 (1990).
5. Richard Canfield et al., *Intellectual Impairment in Children with Blood Lead Concentrations below 10 ug per Deciliter*, 348 New Eng. J. Med. 1517 (2003).
6. Steven G. Gilbert & Bernard Weiss, *A rationale for lowering the blood lead action level from 10 to 2 ug/dl,* 27 Neurotoxicology 693 (Sept. 2006).

9

relevant time) was the source of Roy's exposure to lead-based paint. As with Dr. Sundel, Dr. Simon based his opinion on the record and the documents provided to him by Petitioner's counsel. Dr. Simon had "specific training, experience and certification in the areas of lead paint inspections and lead risk assessment including in the State of Maryland." After reviewing the information provided about Roy's residences, Dr. Simon stated that it was his opinion

> to a reasonable degree of scientific probability that 2525 Oswego Avenue, Baltimore, MD 21218 was the location at which Jakeem Roy was initially, and continued to be, exposed to lead based paint hazards from age 8 months to about 2+ years. It is my opinion to a reasonable degree of scientific probability that 2525 Oswego Avenue, Baltimore, MD 21218 was a substantial, contributing source for Jakeem Roy's lead exposure, elevated blood lead level (EBL) and lead poisoning from ages 8 months to 2+ years.

On 2 January 2013, the Dackmans filed a Motion to Exclude Plaintiff's Experts and a companion Motion for Summary Judgment, arguing that Roy's "experts, Dr. Sundel and Dr. Simon, should be precluded from testifying as to the source of [Roy]'s alleged injuries as they lack both qualifications and factual basis required by Md. Rule 5-702." On 20 February 2013, the Circuit Court (Judge Carrion presiding) conducted a hearing and denied the Dackmans' motion, finding both witnesses qualified under Md. Rule 5-702. Judge Carrion stated relevantly that "a doctor may testify as to medical matters outside his/her area of expertise," acknowledging the well-established Maryland standard that a medical expert witness "need not be a specialist in order to be competent to testify on medical matters," citing *Wantz v. Afzal*, 197 Md. App. 675, 685, 14 A.3d 1244, 1250 (2011) (quotations omitted). The Circuit Court, at this time, noted that the Dackmans' objections to the admission of Dr. Sundel as an expert arose primarily due to

10

his "purported unfamiliarity with lead paint poisoning and lack of [direct] knowledge as to the source of [Roy's] exposure." In keeping with then extant precedent from the Court of Special Appeals and this Court, the Circuit Court concluded that "[o]bjections attacking an expert's training, expertise or basis of knowledge go to the weight of the evidence and not its admissibility." *Baltimore Gas & Elec. Co. v. Flippo*, 112 Md. App. 75, 98, 684 A.2d 456, 467 (1996), *aff'd* 348 Md. 680, 705 A.2d 1144 (1998).

Following Judge Carrion's ruling, the Court of Special Appeals filed an opinion in *City Homes, Inc. v. Hazelwood*, 210 Md. App. 615, 63 A.3d 713, *cert. denied sub nom. Hazelwood v. City Homes*, 432 Md. 468, 69 A.3d 476 (2013), which spoke to Dr. Sundel's qualifications on the record of a separate lead paint suit. In that opinion, following a review of the record, the Court of Special Appeals held with respect to Dr. Sundel's "qualifications . . . that, although he is a board-certified pediatrician licensed to practice medicine in Maryland, he has not received any specialized training nor does he have any experience in treating children with lead poisoning or in identifying the source of a child's lead exposure." *Hazelwood*, 210 Md. App. at 684, 63 A.3d at 754. Due to these deficiencies, the Court of Special Appeals determined that Dr. Sundel was not qualified to testify "as an expert with a concentration in childhood lead poisoning, or to offer an opinion as to the source of [a child's] lead exposure or as to causation." *Id.*

Catching the *Hazelwood* train, the Dackmans renewed their Motion to Exclude Expert Witnesses and Motion for Summary Judgment. In an effort to rehabilitate Dr. Sundel in light of *Hazelwood*, Roy filed an affidavit of the doctor wherein he endeavored to respond to the specific criticisms in *Hazelwood* of his qualifications and to advance a

11

more specific foundation than perhaps had been demonstrated in *Hazelwood* for his relevant bases to testify in Roy's case. On 6 May 2013, the Circuit Court (Judge Peters presiding) conducted an additional hearing to rule on the renewed motions. The following day, the Circuit Court granted the Dackmans' motion for summary judgment, stating that Dr. Sundel was not qualified to provide an expert opinion as to source of lead exposure or to medical causation. In reaching that ruling, Judge Peters did not exclude Dr. Simon as an expert witness as to source of Roy's lead poisoning nor comment on whether Roy's ability to establish the source of the lead poisoning could be proven through adequate circumstantial evidence. Based on the exclusion of Dr. Sundel, however, the Circuit Court found that "without the testimony of a medical expert, Roy could not demonstrate 'the link between [his elevated] blood lead levels and the injuries allegedly suffered by the plaintiff.'" *Roy v. Dackman*, 219 Md. App. 452, 467, 101 A.3d 448, 457 (2014) (alterations in original).

Roy appealed timely to the Court of Special Appeals, which affirmed in a reported opinion. *Roy v. Dackman*, 219 Md. App. 452 (2014). The Court of Special Appeals held that the Circuit Court

> appropriately excluded the proffered expert testimony of [Roy's] pediatrician because he was not qualified as an expert for the same reasons we found him not qualified in *City Homes v. Hazelwood,* 210 Md. App. 615, 63 A.3d 713 *cert. denied,* 432 Md. 468, 69 A.3d 476 (2013), and because there was insufficient evidence to form the factual predicate to support his testimony.

We issued a writ of certiorari, on Roy's petition, *Roy v. Dackman,* 441 Md. 217, 107 A.3d 1141 (2015), to consider the following questions:

12

1) Did the trial court err when it found that a board-certified pediatrician was not qualified as an expert to address the nature and extent of Petitioner's injuries from childhood lead exposure?

2) Did the Court of Special Appeals utilize the incorrect standard of review when it ignored the initial finding that the pediatrician was qualified to offer medical causation opinions and then reviewed his qualifications *de novo*?

For reasons we shall explain, we disagree with the Court of Special Appeals that Dr. Sundel was not qualified to testify in this lead paint poisoning case as to medical causation. Our agreement with the intermediate appellate court as to excluding Dr. Sundel as an expert witness as to source of the lead poisoning (for which element of the claim, Petitioner had another witness – Dr. Simon – and arguably circumstantial evidence[11]) does not change the necessity for reversal here.[12]

## II.

### Standard of Review

We have explained "the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203, 900 A.2d 227, 231 (2006) (internal quotations omitted). A circuit court's decision to

---

[11] We make no judgment as to the legal weight of either other source of such proof as neither was the basis for the Circuit Court's grant of summary judgment.

[12] Having read and considered Respondent's Motion to Strike Petitioner's reply brief and the opposition filed thereto, the Court denies that motion.

exclude a witness will be reversed only if there is a clear abuse of discretion. *Id.*; *see also Samsun Corp. v. Bennett*, 154 Md. App. 59, 67, 838 A.2d 381, 386 (2003).

A circuit court's grant of summary judgment, however, is a question of law that is reviewed *de novo* for legal correctness. *Piscatelli v. Van Smith*, 424 Md. 294, 305, 35 A.3d 1140, 1146 (2012). Under Md. Rule 2-501(f), summary judgment will be granted when "there is no genuine dispute as to any material fact and . . . the party in whose favor judgment is entered is entitled to judgment as a matter of law." We review the grant of a motion for summary judgment to determine whether "there is a dispute as to a material fact sufficient to provide an issue to be tried." *Charles Cnty. Comm'rs v. Johnson*, 393 Md. 248, 263, 900 A.2d 753, 762 (2006) (quotations omitted). We "review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law." *Tyler v. City of Coll. Park*, 415 Md. 475, 499, 3 A.3d 421, 434 (2010) (citing *Charles Cnty. Comm'rs*, 393 Md. at 263, 900 A.2d at 762). This review is done in "the light most favorable to the non-moving party and [we] construe any reasonable inferences that may be drawn from the well-plead facts against the moving party." *Id.*

As noted recently in *Hamilton v. Kirson*, 439 Md. 501, 521 n. 11, 96 A.3d 714, 726 n.11 (2014), *reconsideration denied* (Aug. 27, 2014), typically, when a case involves the grant of summary judgment on the basis that the expert witness "lacks a sufficient factual basis of admissible facts and the admissible evidence (if any) is insufficient independently to prove causation, the circuit court is making a decision on the admissibility of the expert's testimony as part of its summary judgment decision and,

thus, is making a legal decision." We review those cases "on appeal without deference, as the grant of all summary judgment motions are." *Id.*

Because we are reviewing the factual finding of qualifications and predicate competence, as opposed to the legal conclusion about the sufficiency of Dr. Sundel's factual basis, we will review the decision for an abuse of discretion. This case differs from the standard set forth in *Hamilton* because the basis for exclusion of Dr. Sundel was the factual finding that he was not qualified due to his inexperience with lead poisoning medicine and science, not the legal decision to grant summary judgment in the absence of any admissible evidence of medical causation. Therefore, we will only reverse the Circuit Court's decision to exclude Dr. Sundel if we conclude there was a clear abuse of discretion, which we find to be the case here.

**III.**

**A. The Parties' Contentions as to Dr. Sundel's Qualifications**

Roy contends that the Court of Special Appeals erred when it affirmed the Circuit Court's decision to exclude Dr. Sundel as an expert on both source of lead exposure and medical causation. Roy contends that Dr. Sundel, a board-certified pediatrician, based on his knowledge, skill, and training, was qualified to provide expert testimony as to both elements. This failure to admit Dr. Sundel as an expert on both source and medical causation resulted, as Petitioner sees it, in the improper grant of summary judgment to the Dackmans.

The Dackmans respond that the Court of Special Appeals was correct to affirm the exclusion of Dr. Sundel due to his lack of experience with the treatment and

15

identification of lead poisoning in children (or anyone else for that matter). The

Dackmans dispute that the Court of Special Appeals created a new requirement, i.e., that

in order to testify as a medical expert, one must be a specialist. Rather, as Respondent

sees it, the intermediate appellate court's opinion required merely that Dr. Sundel needed

only *some* expertise in the field of lead poisoning, which he lacked.

**B. The Law**

Under Maryland Rule 5-702, expert testimony

> may be admitted, in the form of an opinion or otherwise, if the court
> determines that the testimony will assist the trier of fact to understand the
> evidence or to determine a fact in issue. In making that determination, the
> court shall determine (1) whether the witness is qualified as an expert by
> knowledge, skill, experience, training, or education, (2) the appropriateness
> of the expert testimony on the particular subject, and (3) whether a
> sufficient factual basis exists to support the expert testimony.

These three factors have been plumbed generally and well in many appellate opinions of

our appellate courts.

To satisfy the first requirement, we have explained that "a witness may be

competent to express an expert opinion if he [or she] is reasonably familiar with the

subject under investigation, regardless of whether this special knowledge is based upon

professional training, observation, actual experience, or any combination of these

factors." *Radman v. Harold*, 279 Md. 167, 169, 367 A.2d 472, 474 (1977).

Fundamentally, an expert witness's opinion is expected to "give the jury assistance in

solving a problem for which their equipment of average knowledge is inadequate." *Id.*

To qualify as an appropriate medical expert under Md. Rule 5-702(2), a doctor is

not required to have ever performed the surgery in question or even to have observed that

specific patient who may be the plaintiff. *See Hazelwood*, 210 Md. App. at 678, 63 A.3d at 750 (citing *Radman*, 279 Md. at 170, 367 A.2d at 472). Inquiries about a doctor's personal experience performing a certain procedure goes to the weight, not the admission vel non, of the doctor's testimony. Admission of a doctor's testimony is a threshold question, specifically as to which we have observed:

> A witness may qualify [as an expert] if he possesses special and sufficient knowledge regardless of whether such knowledge was obtained from study, observation or experience. . . . A law professor may be an expert on trial procedure even though he has never tried a case. There are many expert astronauts who have yet to make a space flight. In light of the fact that we have never treated expert medical testimony any differently than other types of expert testimony, . . . we perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as a medical expert merely because he is not a specialist or merely because he has never personally performed a particular procedure.

*Radman*, 279 Md. at 171, 367 A.2d at 474-75 (citations omitted). Therefore, basing an opinion solely on "medical" literature and personal observation does not justify necessarily excluding a witness from qualifying as a medical causation expert:

> A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources. The knowledge of an expert in any science or art would be extremely limited if it extended no further than inferences from happenings within his own experience.

*Hazelwood*, 210 Md. App. at 677, 63 A.3d at 749-50 (*citing Radman*, 279 Md. at 169-70, 367 A.2d at 472).

An adequate factual basis for expert testimony is required under Md. Rule 5-702(3) so that the testimony "constitutes more than mere speculation or conjecture."

17

*Exxon Mobil Corp. v. Ford*, 433 Md. 426, 478, 71 A.3d 105, 136 *as supplemented on denial of reconsideration,* 433 Md. 493, 71 A.3d 144 (2013) (citing *Giant Food, Inc. v. Booker,* 152 Md. App. 166, 182–83, 831 A.2d 481, 490 (2003)). Accordingly, Md. Rule 5-702(3) "consists of two distinct sub-factors. It is first required that the expert have available an adequate supply of data with which to work. It is then required that the expert employ a reliable methodology in analyzing that data." *CSX Transp., Inc. v. Miller*, 159 Md. App. 123, 189, 858 A.2d 1025, 1063 (2004). With respect to this requirement, our intermediate appellate court brethren have said that a "factual basis 'may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions.'" *Taylor v. Fishkind*, 207 Md. App. 121, 143, 51 A.3d 743, 756 (2012) (citing *Sippio v. State,* 350 Md. 633, 653, 714 A.2d 864, 874 (1998)).

Thus, under Md. Rule 5-702, an expert witness who proposes to testify on medical injury must base his or her opinion on reliable knowledge, skill, and experience, but is not required necessarily to be a specialist. It may well be that a "specialist" who testifies as to certain opinions may receive greater weight by the fact-finder than his or her competing non-specialist, but that is not resolved ordinarily as a threshold matter by a judge. Cross-examination is the usual crucible for persuading the fact-finder which witness merits the greater weight. "For expert testimony to be admissible, his or her conclusions must be based on a sound reasoning process explaining how the expert arrived at those conclusions." *Exxon Mobil Corp.*, 433 Md. at 483, 71 A.3d at 139.

# IV.

## Analysis

Although Dr. Sundel may not be the most qualified expert witness on medical causation, a court's concern at the summary judgment stage is whether his testimony is admissible. Based on Dr. Sundel's background, affidavit, and deposition (which create a better foundation than was available in the record in *Hazelwood*), it is apparent that he is competent, under the standards set forth in Md. Rule 5-702, to testify as an expert as to medical causation here. The Circuit Court abused its discretion, therefore, in finding him unqualified to testify as to medical injury.[13]  Nevertheless, we do agree that, with no personal knowledge and his reliance on circumstantial evidence as to how and where Roy was exposed to lead paint, Dr. Sundel was not shown to be competent on this record to

---

[13] Although this case is confined to analysis of a ruling on Dr. Sundel's qualifications (as revealed by this record) to testify on a particular topic, it is foreseeable that situations may arise where a trial judge's ruling on the substance of an expert witness's actual opinion would be afforded greater latitude in excluding testimony that might, for example, be cumulative or more prejudicial than probative.  *See* Md. Rule 5-403 (providing that even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . or needless presentation of cumulative evidence"); *see also S.B. Thomas, Inc. v. Thompson*, 114 Md. App. 357, 382-83, 689 A.2d 1301, 1313 (1997)(explaining that "the stronger the case for the causal connection even absent expert medical testimony, the lesser the need for [expert] testimony; the weaker the non-medical case for the causal connection, the greater the need for [expert] testimony"); *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 180, 831 A.2d 481, 489 (2003) (discussing how, in some cases, unless "there is lacking an obvious cause and effect relationship that is within the common knowledge of laymen," expert witness testimony may not be required on medical causation and therefore it would be within a trial judge's discretion to exclude the expert witness's testimony as cumulative).

testify as to the source of Roy's exposure. Thus, it was not an abuse of discretion for the Circuit Court to exclude his testimony on that element.

**A. Source of Lead Exposure**

In *Taylor v. Fishkind*, 207 Md. App. 121, 51 A.3d 743 (2012), the plaintiff identified a pediatrician, Dr. Henri Merrick, as one of her expert witnesses. The basis for designating Dr. Merrick as an expert was explained as:

> Dr. Merrick is a pediatrician who has reviewed records and reports and is expected to render an opinion that the deficits of Jazminn Taylor are related to her exposure to lead paint at the Defendants' properties, and that she has permanent brain damage, and a loss of Intelligence Quotient points as a result of that lead exposure. Dr. Merrick's opinions are based upon her review of the medical, environmental and school records related to this case and also upon the numerous medical studies that link cognitive deficiencies and IQ loss to early childhood lead exposure. Further, Dr. Merrick relies upon her medical education, training and experience in reaching her conclusions.

*Taylor*, 207 Md. App. at 126, 51 A.3d at 746. Her report concluded that the plaintiff was exposed at two separate properties, based on: "the age of the dwellings, the described conditions of the first dwelling, the detection of lead in an exterior window apron of this first dwelling and [the plaintiff's] blood lead levels while living at each dwelling." *Taylor*, 207 Md. App. at 130, 51 A.3d at 748.

The circuit court granted summary judgment to the defendant in *Taylor* because the plaintiff relied solely on Dr. Merrick's testimony, which lacked a factual basis to establish, within a reasonable degree of medical certainty, that the subject properties were the source of lead. *Taylor*, 207 Md. App. at 136, 51 A.3d at 752. Dr. Merrick lacked a sufficient factual basis as to the source of lead because her opinion that the interior of the

20

subject property "contained lead-based paint [was] only supported by the age of the house and the presence of lead on one component of the exterior of the house." *Taylor*, 207 Md. App. at 142, 51 A.3d at 755. Dr. Merrick admitted that she could not rule out the possibility of other sources. *Id.* The reliance on scant circumstantial evidence alone was not enough to allow her to opine as to the source of lead beyond mere speculation.

In 2013, we decided *Ross v. Hous. Auth. of Baltimore City*, 430 Md. 648, 63 A.3d 1 (2013), which presented facts similar to the present case. We held that the circuit court did not abuse its discretion when it excluded the expert testimony of a pediatrician who was retained to "establish the defendant's building as the source of the plaintiff's lead exposure and elevated blood lead levels." *Ross*, 430 Md. at 651, 63 A.3d at 2.

The proposed expert, Dr. Jacalyn Blackwell-White, a pediatrician with over 20 years-experience, who provided "an opinion on whether [the plaintiff] had been exposed to toxic lead levels and whether that exposure had caused brain impairment." *Ross*, 430 Md. at 656, 63 A.3d at 5. Dr. Blackwell-White's review of the plaintiff's medical records and information relating to the two subject properties led her to conclude that the plaintiff "had been exposed to lead-based paint at both residences, that such exposure 'resulted in sustained toxic blood levels' during her early developmental years, and that the end result would be life-long neuropsychological impairment." *Ross*, 430 Md. at 656, 63 A.3d at 5-6.

Even though Dr. Blackwell-White's medical practice included the identification and treatment of childhood lead poisoning patients, she admitted that "she was not capable of definitively determining the source of lead exposure [and that] she was merely

21

assessing risks." *Ross*, 430 Md. at 657, 63 A.3d at 6. She concluded that the subject

property was the source of lead exposure because of:

> (1) the increase in [the plaintiff's] elevated blood lead levels when she moved from the previous address to the HABC Payson Street home; (2) the age and condition of the property as well as the lead inspection tests from the Payson Street home, which Dr. Blackwell–White described as indicating the presence of lead (although she conceded that some of the test levels on which she relied did not meet HUD thresholds for lead hazard); (3) the access [the plaintiff] had, as a child, to the areas suspected to contain lead paint dust inside the house; (4) the possibility that lead dust would escape into the living area (a) from the exterior window frame through the open window and (b) from the plaster walls suspected to contain lead paint through cracks in the sheetrock; and (5) the lack of other likely sources of lead exposure during the time [the plaintiff] was living at the Payson Street home.

*Ross*, 430 Md. at 659, 63 A.3d at 7-8. The circuit court excluded only Dr. Blackwell-

White's testimony as to the source of the plaintiff's lead exposure because it found that

source and medical causation were two distinct questions. *Ross*, 430 Md. at 662, 63 A.3d

at 9.

In *Ross,* we agreed with the exclusion of Dr. Blackwell-White's testimony as to

source of lead exposure. We reasoned that her opinion would not assist the trier of fact as

she

> did not explain adequately how she reached [her] conclusion [and that m]erely reciting certain information that she took into account and then stating the ultimate conclusion without explaining how and by what expert method that information was weighed did not provide a basis by which the trier of fact could evaluate that opinion.

*Ross*, 430 Md. at 663, 63 A.3d at 10. Her opinion as to source was excluded properly

because it was based only on an assessment of risks and an assumption of the presence of

lead paint in the subject property.

For similar reasons, we agree that Dr. Sundel was not competent to testify as to the source of Roy's lead exposure. Dr. Sundel's proposed opinion falls victim to the same problems as those discussed in *Taylor* and *Ross*. As a board-certified pediatrician, his reliance on circumstantial evidence alone is not enough for him to be deemed competent as an expert on the source of lead. Much like Dr. Merrick in the *Taylor* case, Dr. Sundel's conclusion was based solely on scant circumstantial evidence, including the age of the home and exterior tests of the paint on the dwelling at 2525 Oswego Avenue. Although we have held that a lead poisoning case may succeed grounded on suitable circumstantial evidence as to source, *Hamilton*, 439 Md. at 527, 96 A.3d at 730, it is not enough for an expert to conclude that a certain property is the source of the child's exposure to lead when other potential sources have not been eliminated. *Compare Dow v. L & R Properties, Inc.*, 144 Md. App. 67, 75-76, 796 A.2d 139, 143-44 (2002) (Even without expert testimony, the circumstantial evidence was sufficient to survive summary judgment because "[i]f believed, the evidence offered by appellants in opposition to the motion for summary judgment could establish that the chipping and peeling paint inside 1237 Myrtle Avenue was the only possible source of [the child's] lead poisoning.").

Akin to Dr. Blackwell-White's proffered testimony in *Ross*, Dr. Sundel's tendered conclusion that 2525 Oswego Avenue was the source of Roy's exposure to lead-based paint did not rule out other potential sources. There is no discussion in the record of Dr. Sundel's methods to eliminate other environmental sources of lead exposure. His conclusion that 2525 Oswego Avenue was a substantial contributing source of Roy's lead exposure appears to be based solely on the assumption that a child's home is the "most

23

probable source of elevated blood lead levels 'until proven otherwise,' particularly if the house was built before 1970." *Ross*, 430 Md. at 660, 63 A.3d at 8. We concluded in *Ross*, due the variety of potential sources of the plaintiff's lead exposure, that Dr. Blackwell-White's conclusion as to source of lead exposure was "as likely to confuse as to assist a jury." *Ross*, 430 Md. at 664, 63 A.3d at 10.[14]

**B. Medical Causation**

In *Ross*, the circuit court concluded that "Dr. Blackwell–White was qualified to testify as an expert in pediatrics and childhood lead-poisoning." *Ross*, 430 Md. at 662, 63 A.3d at 9. We pointed out that, based on the record in *Ross*, it appeared that "the only portion of Dr. Blackwell–White's testimony that was excluded was her opinion that the Payson Street home was the source of [the plaintiff's] lead exposure during the relevant time period that led to enhanced blood lead levels." *Id.* Even after she was considered competent to testify as to medical causation, Dr. Blackwell-White "testified at one point that she was merely identifying 'potential risk' and could not make any statement as to causation with certainty." *Ross*, 430 Md. at 664, 63 A.3d at 10.

Dr. Blackwell-White was deemed competent to testify as to medical causation based solely on her qualifications and experience as a pediatrician with 20 years in

---

[14] As noted *supra*, exclusion of Dr. Sundel as an expert witness competent to testify on source of lead poisoning was not the reason summary judgment was granted. There remained, arguably at least the potential for Dr. Simon and/or other circumstantial evidence to fill that void.

practice.[15]   Within her lead paint victim practice, Dr. Blackwell-White relied on recommendations from the Centers for Disease Control, the American Academy of Pediatrics, the Maryland Department of the Environment, and numerous other academic sources. *Ross*, 430 Md. at 658, 63 A.3d at 6-7. Effectively, her testimony established that this research and her methods of identifying lead exposure risks were considered "best practices" and "generally accepted in the pediatric medical community." *Ross*, 430 Md. at 657, 63 A.3d at 6. Here, Dr. Sundel has similar qualifications, albeit no direct hands-on experience with treating lead poisoning patients.

Respondents rely on *Hazelwood* to illustrate the deficiencies of Dr. Sundel's qualifications here. There are material differences, however, between the records in the two cases as to his qualifications. The Court of Special Appeals concluded in *Hazelwood* that Dr. Sundel was not competent to testify as a medical expert under Maryland Rule 5-702 because he had "never testified as an expert in a lead paint poisoning case . . . and [he] acknowledged that he [wa]s not a certified lead risk assessor." *Hazelwood*, 210 Md. App. at 685, 63 A.3d at 754. Additionally, Dr. Sundel was deemed unqualified on that occasion because he had not published or lectured on the topic of lead paint poisoning, he

---

[15] As indicated previously, Md. Rule 5-702 provides that the court shall determine "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." The circuit court noted that Dr. Blackwell-White's testimony as to causation failed to satisfy the first and third factors of this rule, but still considered her qualified as a medical expert for purposes of causation testimony.

was not a board-certified psychologist, and he did not administer or interpret IQ tests in his practice. *Hazelwood*, 210 Md. App. at 685-86, 63 A.3d at 754-55.

In *Hazelwood*, the Court of Special Appeals concluded that Dr. Sundel lacked "specialized knowledge concerning childhood lead poisoning, and specifically, the determination of the source of a child's lead exposure and causation." *Hazelwood*, 210 Md. App. at 686, 63 A.3d at 755. This reasoning is overly demanding because the standard set forth in Md. Rule 5-702 is not that an expert have "specialized knowledge." The Rule requires only that the "witness is qualified as an expert by knowledge, skill, experience, training, or education" because the purpose of expert witness testimony is to assist the finder of fact, in this case, a jury composed likely of lay persons. *See* Md. Rule 5-702(1).

A major difference between the factual record in *Hazelwood* and the one presented here relates to Dr. Sundel's respective preparation for rendering an opinion. The record in *Hazelwood* lent itself to the conclusion that Dr. Sundel read articles generally about lead paint poisoning, but had not studied intensively the written materials. He was admitted by the Circuit Court in *Hazelwood* as "an expert pediatrician, especially with the *concentration* or including the concentration on his research and *experience in childhood lead paint* because his testimony is reflective of his special knowledge," a conclusion for which the Court of Special Appeals failed to find support in that record. *Hazelwood*, 210 Md. App. at 687, 63 A.3d at 755 (emphasis added).

Here, in his fourteen-page affidavit submitted post-*Hazelwood*, Dr. Sundel endeavored to be more specific and shore-up the supposed deficiencies in his

26

qualifications. He attested that he had read extensively on lead paint poisoning in adolescents: "Since the *Hazelwood* trial, I continue to review all new published literature and public policy statements from the Center for Disease Control that concern childhood lead poisoning." Although conceding that he was not a "Certified Lead Risk Assessor," he maintained that, in his position as a board-certified pediatrician, he was

> expected to know that the Center for Disease Control [CDC] and American Academy of Pediatrics [AAP] mandate that if [he] should have a patient under the age of six (6) who was found to have an elevated blood lead level [that] it would be necessary to investigate potential sources of the exposure to lead by asking the parent or guardian standard questions regarding the current residence, the age and condition of the paint, whether there [sic] any other young children with elevated lead levels in the home, do any relatives work in demolition of old buildings, or other relevant occupational settings, does the child visit other locations on a frequent basis, or does the child come in contact with other potential lead containing substances.

Dr. Sundel noted that in *Hazelwood* he "did not have a report from Dr. Simon or any other professional lead risk assessor and toxicologist."

He maintained that it is part of his normal course of business to consult psychologists or neurologists to determine if exposure to any environmental toxin, including lead, could have resulted in brain damage, cognitive defects or physical symptoms exhibited by a patient. As part of these consultations, Dr. Sundel would work with a pediatric neurologist to determine "diagnosis options and treatment options and to assist with a determination of etiology." Dr. Hurwitz's report of his four hour, in-person evaluation of Roy was one of the many reports that Dr. Sundel claimed to have reviewed in the present case. Although Dr. Sundel did not work directly with Dr. Hurwitz, the report provided Dr. Sundel with Dr. Hurwitz's interpretation of his testing and additional

27

relevant background on Roy. Dr. Sundel attested further in his affidavit that he has read numerous articles from various sources (*see* fn. 10 *infra*), including the CDC, the American Academy of Pediatrics, and the National Institutes of Health. Dr. Sundel also relied on a study conducted by Bruce Lanphear, which has been cited to and discussed extensively by other studies employing similar tests relating to IQ loss and childhood lead poisoning.[16]

"Under Maryland law, as a general proposition, in order to qualify as an expert, the witness need not possess special knowledge if he or she is generally conversant with the subject of the controversy." *Samsun Corp.*, 154 Md. App. at 68, 838 A.2d at 386.

---

[16] *See* Bruce Lanphear et al, *Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis*, 113 Envtl. Health Perspectives 894 (July 2005). This study has been cited to in books (*see* Curtis D. Klaassen, Casarett and Doull's Toxicology: The Basic Science of Poisons (7th ed. 2008)) and multiple journals (*see generally* David C. Bellinger, *Very low lead exposures and children's neurodevelopment*, 20 Current Op. in Pediatrics 172 (2008); Donald T. Wigle et al., *Epidemiologic evidence of relationships between reproductive and child health outcomes and environmental chemical contaminants,* 11 J. of Toxicology & Envtl. Health 373 (2008); Steven G. Gilbert & Bernard Weiss, *A rationale for lowering the blood lead action level from 10 to 2μg/dL*, 27 Neurotoxicology 693 (2006)).

Respondents take issue with the use of this study, arguing that there "have been peer-reviewed studies published in highly respected journals not only directly contradicting the studies on which Dr. Sundel relies, but also calling into question the application of these studies to any one individual without real-life evidence of actual IQ point loss." What Respondents fail to take into account is the very nature of scientific research and expert witness testimony: "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993). Dr. Sundel's reliance on the Lanphear study does not invalidate the entire basis of his opinion, even if the Lanphear study is contrary to the results of other studies as alleged by Respondents. Such is the grist for cross-examination and dueling experts and for resolution by the relative weight assigned by the fact-finder.

28

Dr. Sundel's academic and experiential qualifications include a three year pediatric residency in New York, a two year pediatric fellowship at Johns Hopkins University Hospital, and more than 20 years in practice. With this experience and as a board-certified pediatrician, Dr. Sundel was shown on this record to possess a sufficient background from which to provide an opinion as to the injuries claimed to have been suffered by Roy as the result of alleged exposure to lead. Whether a jury will find his testimony persuasive will depend, in large measure, on the effectiveness of Respondent's cross-examination and a comparison/weighing by the jury against Respondent's competing witness(es)' testimony.

## V.

### Conclusion

As we held in *Ross*, medical causation and source of lead exposure are distinct questions which generally are the subject of expert witness testimony in childhood lead-based paint poisoning cases. In *Ross*, we indicated that because "the Circuit Court's ruling with regard to Dr. Blackwell–White purported only to exclude her testimony as to the source of the lead exposure, the remainder of her testimony, including foundational and background information on lead poisoning" would still be considered with the other circumstantial evidence, "which presumably would foreclose a grant of summary judgment." *Ross*, 430 Md. at 670-71, 63 A.3d at 14.

Similarly, in the present case, with the arguable presence in the on-deck circle of Dr. Simon, an industrial hygienist and toxicologist, to speak to the source of lead, and our decision that Dr. Sundel is competent to testify as a medical causation expert, it was

29

improper for the Circuit Court to grant summary judgment when it did. Therefore, we reverse the judgment of the Court of Special Appeals and direct the remand of the case for further proceedings in the Circuit Court for Baltimore City. [17]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS**.

---

[17] Because we conclude that the Circuit Court abused its discretion in excluding Dr. Sundel as an expert witness as to medical causation of injury, we need not address Petitioner's second question presented to this Court regarding the Court of Special Appeals use of a *de novo* standard of review.

Circuit Court for Baltimore City
Case No. 24-C-11-004528

Argued: September 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 6

SEPTEMBER TERM, 2015

_____

JAKEEM ROY

v.

SANDRA B. DACKMAN, ET AL

_____

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Harrell, Glenn T., Jr. (Retired, Specially
                              Assigned),
Wilner, Alan, M. (Retired, Specially
                              Assigned),

JJ.

_____

Opinion by McDonald, J., dissenting in part,
which Battaglia, J. joins.

_____

Filed:  October 16, 2015

In applying an "abuse of discretion" standard, this Court has often said that an abuse of discretion occurs "where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles ... when [the decision] is well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *E.g., Nash v. State*, 439 Md. 53, 67, 94 A.3d 23 (2014) (quoting *North v. North*, 102 Md. App. 1, 648 A.2d 1025 (1994)) (internal citations and quotation marks omitted).

When a trial court ruling is assessed on an abuse of discretion standard, this means that there is not necessarily one right answer, nor is the trial court required to come up the *best* answer or the answer preferred by the appellate court.

If the Circuit Court in this case had determined that expert testimony by Dr. Sundel on medical causation would be of assistance to the jury and that Dr. Sundel was qualified to provide such testimony for the reasons set forth in the Majority opinion, I would have concluded that the court had not abused its discretion.

But that does not mean that Circuit Court abused its discretion in coming to a different conclusion. The Circuit Court carefully considered very recent appellate decisions concerning expert witnesses in lead paint cases, including one in which the Court of Special Appeals specifically held that Dr. Sundel was not qualified to testify as an expert on medical causation.[1] The Circuit Court did not blindly adopt the conclusion

---

[1] *City Homes, Inc. v. Hazelwood,* 210 Md. App. 615, 63 A.3d 476 (2013).

of the intermediate appellate court, but explicitly assessed the asserted additions to Dr. Sundel's qualifications since the prior case and the fact that he still had no hands-on experience with victims of lead paint poisoning in deciding to apply the holding of the Court of Special Appeals.

I do not believe it was an abuse of discretion for the Circuit Court to conclude that the enhancements in Dr. Sundel's qualifications from the prior case – his longer reading list and his apparently better preparation for pre-trial depositions – did not convert him into a qualified expert on medical causation in this case. It cannot be said that "no reasonable person" would take that view, that the court acted without reference to any guiding principles, or that its answer was "beyond the fringe" of what would be minimally acceptable.

In my view, the answer provided by the Majority opinion as to whether Dr. Sundel should be allowed to testify on medical causation in lead paint cases is probably the better answer, but that does not mean that the Circuit Court here abused its discretion in ruling as it did. Indeed, it seems odd to hold that a Circuit Court "abused its discretion" by following a very recent appellate decision precisely on point.

This case may illustrate the tension that an appellate court faces when it seeks to provide guidance for the future by indicating a better answer and its limited role when applying an abuse of discretion standard.

Judge Battaglia advises that she joins this dissent.

2